# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**April 30, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

| | | |
|---|---|---|
| THE REALTY SHOP, INC., | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| RR WESTMINSTER HOLDING, INC., | ) | Davidson Chancery |
| | ) | No. 94-293-I |
| Defendant/Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | Appeal No. |
| JOHN S. CLARK CO., INC.; | ) | 01A01-9609-CH-00418 |
| SENASH, INC.; and | ) | |
| CLARENDON NATIONAL INS. CO., | ) | |
| | ) | |
| Defendants. | ) | |

## APPEAL FROM THE DAVIDSON COUNTY CHANCERY COURT
## AT NASHVILLE, TENNESSEE

## THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

For The Realty Shop, Inc.:

Gregory L. Cashion
Carol R. Dunn
Manier, Herod, Hollabaugh & Smith
Nashville, Tennessee

For RR Westminster Holding, Inc.:

John Branham
Donald Capparella
    Branham & Day
Nashville, Tennessee

Bryan Cave
Thomas C. Walsh
St. Louis, Missouri

## AFFIRMED IN PART; MODIFIED IN PART;
## AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a problem-plagued commercial development in Nashville called Thompson Station. To shield the project from the developer's financial problems, the principals agreed that a corporation owned by the holding company that owned the contractor would own the project during construction and that the developer would have an option to purchase that corporation upon completion of the work. After the project was completed with substantial cost overruns, the developer attempted to exercise its option without taking the overruns into consideration. The holding company declined to sell the corporation to the developer and eventually sold the project to a group of foreign investors. The developer filed suit in the Chancery Court for Davidson County, alleging that the holding company and the corporation formed to own the project had breached the option agreement and that the contractor and the holding company's parent corporation that had provided the construction financing had procured the breach. The trial court, sitting without a jury, awarded the developer $1,089,674 in damages and $277,866 in prejudgment interest and dismissed the claims against the contractor and the construction lender.[1] Both the holding company and the developer have appealed. We affirm the dismissal of the developer's procurement of the breach of contract claims; however, we modify the judgment against the holding company and the corporation formed to own the project because the parties, by their conduct during the course of construction, waived their right to rely on the written change order requirements in both the construction contract and the option agreement.

## I.

Ed H. Street, Jr. is a real estate developer headquartered in Johnson City, Tennessee who concentrates on the development and construction of shopping centers. He is a principal of a partnership called Ed Street Company that engages in development and construction, and he is also president of The Realty Shop, Inc. ("The Realty Shop"), a corporation engaged only in real estate development.[2] The Realty Shop's corporate charter was issued in 1984, revoked in 1985, and reinstated in December 1991.

---

[1] The trial court also awarded other relief from the corporation that owned the project during construction. This relief is not at issue on this appeal because the parties have compromised and settled them. The trial court also granted the corporation formed to own the project a judgment against the developer for lease payments it has collected and not paid over. This portion of the judgment has not been appealed.

[2] The Realty Shop is Mr. Street's alter ego, even though Mr. Street's wife and a family corporation own all of the corporate stock. The parties have never disputed Mr. Street's power to bind The Realty Shop.

In 1991, Mr. Street undertook to develop two shopping center projects each of which included a Lowe's Hardware Center. One was located in Johnson City and the other in Nashville. The Johnson City project ended up placing a great financial strain on Mr. Street's business. The construction lender foreclosed on the project, and The Realty Shop eventually filed for bankruptcy protection in the Eastern District of Tennessee. The bankruptcy proceeding was later dismissed in March 1992 on the ground that it had been brought in bad faith. As a result, Mr. Street became exposed to approximately $500,000 in personal liability and was sued more than ten times for bad debts in 1993. Mr. Street's financial reversals stemming from the Johnson City project caused the Nashville project to assume great significance for him.

Mr. Street initially became interested in the 21-acre site on Nolensville Road in Nashville because of the high traffic volume on Nolensville Road, the population density in the vicinity of the project, and the apparent interest of potential anchor tenants in the location. The site was at the base of a steep rock slope and was occupied at the time by a few rental houses, some small businesses, and an automobile junkyard. Mr. Street obtained options to purchase the property with the idea to develop a $10,300,000 shopping center called Thompson Station containing a Lowe's Hardware Center, a Food Lion grocery store, and a Phar-Mor drug store. His original intention was to begin construction in the summer of 1992 and to complete the project in early 1993.

After obtaining options to purchase the property in April 1991, Mr. Street began negotiating leases with the prospective tenants. He retained an engineer to prepare preliminary site plans and to assist with having the property rezoned. He also retained an architect to adapt the tenants' prototypical plans to the site. As early as March 1992, Mr. Street began discussing the construction of the project with several general contractors, including John S. Clark Company, Inc. ("Clark"), a large North Carolina general contractor with a national reputation for constructing retail space.[3] In April 1992, Mr. Street began to push Clark for a quick decision and requested a proposal that included not only the construction of the project but also the construction financing.

The elements of the project continued to coalesce between June and September 1992. Mr. Street obtained a permanent loan commitment from Life Insurance Company of Georgia and also found a group of German investors, who had formed a limited partnership called Tennessee Equity Fund, L. P. ("Tennessee Equity Fund") and who were interested in

_____

[3]Clark had already constructed more than twenty Food Lion stores and ten Lowe's stores.

purchasing the completed project. In July 1992, he finalized a lease with Food Lion, and in September 1992 he obtained a lease from Lowe's. These leases contained deadlines for the commencement or completion of the major phases of construction and gave the tenants the right to cancel the leases if these deadlines were not met. Both Lowe's and Food Lion expected that construction of the project would commence by no later than December 15, 1992, and Food Lion's lease also required pouring footers for the foundation to begin by March 1, 1993.

Clark's representatives visited the proposed project in June 1992 to discuss the roles that Clark, its parent company, RR Westminster Holding, Inc. ("RR Westminster"), and the owner of its parent company, Clarendon National Insurance Company ("Clarendon"), would play in the development. Following the visit, Monty K. Venable, Clark's secretary-treasurer, informed Mr. Street that Clark "must be careful to structure a package that is fair and reasonable to both parties. Certainly we are looking to receive more compensation since we are taking greater risk and providing substantial additional services other than just construction but it still must be fair and reasonable." In order to assist Clark in preparing its proposal, Mr. Street provided Mr. Venable with a topological map supplied by the current property owners, the prototype building plans provided by Food Lion and Lowe's, and a site plan. The site plan called for the construction of a pre-split rock wall on the side of the property with a steep rock slope.[4]

The project suffered several setbacks following Clark's visit. The principal setback was Phar-Mor's decision to withdraw from the project. Without a replacement tenant, Mr. Street was required to continue with only two tenants. Accordingly, he reduced the size of the development from twenty-one to fifteen acres, and he reduced the project from $10,300,000 to approximately $6,500,000. Mr. Street informed Clark of Phar-Mor's withdrawal from the project and requested a proposal based on the revised project.

On September 3, 1992, Mr. Venable informed Mr. Street that Clark would accept the construction portion of the project for $4,430,065 but that the risks were too great for Clark to accept total responsibility for the construction and financing of the project, including the indirect costs, for $6,500,000. With reference to Phar-Mor's withdrawal, Mr. Venable stated,

---

[4]The engineer Mr. Street originally retained to prepare the site plan recommended constructing a retaining wall to prevent the slope from collapsing. After Mr. Street discharged this engineer following a fee dispute, the second engineer prepared a site plan calling for a pre-split rock wall (cutting through the rock at a near vertical angle leaving the rock face exposed). This alternative was considerably less expensive than building a retaining wall. Mr. Street never informed Clark that the original site plan called for the construction of a retaining wall. This pre-split rock wall later proved to be one of the many problems encountered during construction.

"Certainly the Phar Mor disaster was unexpected and unfortunate but it still leaves you with a home run of a project although perhaps not a grand slam." After another two weeks of negotiations, Mr. Street and Mr. Venable signed a letter agreement on September 22, 1992, in Mr. Venable's office in Mount Airy, North Carolina.

In the letter agreement, Clark agreed to provide the "construction and construction financing"[5] for a "guaranteed maximum price" of $6,649,105 plus an allowance of $188,000 for indirect costs and contingencies. To insulate the project from Mr. Street's growing financial problems, the parties agreed to form a new corporation that would own the development during the construction phase and would act as the borrower of the interim construction funds. Mr. Street agreed to convey his interests in the project to the new corporation in return for an agreement that he could buy back the project when it was completed. The letter agreement also required the new corporation to furnish (1) a traffic light at a cost not to exceed $36,000, (2) permanent financing, (3) architectural and engineering services at a cost not to exceed $70,000, (4) an approved site development plan ready for building permit issuance on or before October 9, 1992, and (5) a contract to purchase the property for $1,400,000. The parties understood that the new corporation would comply with these conditions when Mr. Street assigned it his contracts with the engineer and the architect, his permanent loan commitment from Life Insurance Company of Georgia, and his options to purchase the property.

Mr. Street could not provide Clark with the completed site plan or the completed plans for the Lowe's or Food Lion stores when they signed the letter agreement. In late September, Clark reminded Mr. Street that "we need final approved working drawings to maintain your scheduled dates for your project." In October, the engineer employed by Mr. Street provided Clark with a revised site plan reflecting Phar-Mor's withdrawal from the project. However, the final plans for the two stores were still not forthcoming because the tenants had not yet finalized the design of their spaces.

In early November 1992, Mr. Street urged Clark to begin work because "Lowe's is extremely upset with me that Nashville has not started. I have given them a date of December 15, 1992 as the outside date for ground breaking." Mr. Street also assured Food Lion that construction would begin by December 15, 1992 despite the lack of final plans and even though he had not yet exercised the option to purchase the property.

_____

[5]The parties understood that Clarendon would provide the construction financing.

-5-

Later in November, Mr. Venable informed Mr. Street that there already was a $225,000 shortfall stemming from the additional site work costs and that "[i]t is going to be impossible to get you a binding commitment until we fully identify all of the costs on the dynamic and ever changing project." Elaborating on their September 22, 1992 letter agreement, Mr. Venable also informed Mr. Street in a fax dated November 20, 1992 that

> The Thompson Station development including the outparcel will be owned in [sic] a new corporation. The stock of the corporation will be owned by our parent company or their wholly-owned subsidiary. You will have the option to acquire the stock of this corporation at a pre-determined price for a set period of time after completion. In the event that you do not purchase the stock, obviously then the project and its improvements would become the property of our parent company or its assigns. We will still agree to pay the developer's fee over the life of the construction.

Mr. Street responded that he was prepared to proceed with the contract and that

> [w]e must somehow start or break ground by December 15, 1992. Lowe's is very upset with me although we have not had control over the delays which Lowe's has caused. You know how it goes, it doesn't matter it is the developer's/contractor's fault. Let's work together hard and get this started.

He also stated that he assumed "the pre-determined price for us to purchase the stock would would [sic] be the agreed price for your turn key construction."

To accomplish the portion of the agreement calling for the creation of a new corporation to own the development during the construction phase, Mr. Street incorporated SENASH, Inc. ("SENASH").[6] All of SENASH's outstanding stock was owned by RR Westminster. On December 14, 1992, SENASH and Clark executed a standard form AGC construction agreement in which Clark agreed to construct the project for $4,669,105.[7] The work included two buildings conforming to the tenant's specifications, road construction, parking lot construction, and landscaping. Specifically excluded from the scope of the work were (1) the demolition and removal of the existing structures on the site, (2) the removal and clean-up relating to the automobile junkyard on the site, (3) patching work required to repair pre-split rock walls if irregularity occurred in the rock seams, (4) additional costs above the standard Lowe's and Food Lion prototype buildings, and (5) design coordination. The

---

[6]The name "SENASH" was an acronym. The "S" was the first letter of Mr. Street's last name; the "E" stood for Adam Epstein who was working with Mr. Street on the Thompson Station project; and the "NASH" was an abbreviation of Nashville, the project's location.

[7]Mr. Venable executed the contract on behalf of SENASH, and Joe B. Hennings, Clark's president, executed the contract on behalf of Clark.

contract also provided that "Owner's representative (Ed H. Street) to coordinate and furnish all design. John S. Clark Company, Inc. to pay for design out of stated allowance."

In addition, the contract obligated SENASH to be responsible for increases in the construction costs due to delays not caused by Clark for changes required by the building codes and to make equitable adjustments in the contract price for delays in the work that were not Clark's responsibility. SENASH also agreed to pay Clark an additional 7.5% to cover main office overhead and profit. The contract provided that

> In order to expedite the project, it may be necessary for the Contractor to proceed with changes in the Work based on a verbal authorization from the owner or owner representative. As soon as practicable, the Contractor will notify the Owner in writing of the cost of the change in the Work and the additional time, if any, necessary to complete said change in the Work.

Clark and Jones Bros., Inc., ("Jones Brothers") began work on the site on December 15, 1992 in order to fulfill Mr. Street's commitment to Lowe's and Food Lion. They were required to obtain the permission of the current property owners because neither Mr. Street nor SENASH had exercised the option to purchase the property. They were also prevented from commencing full-scale grading operations because the property still contained several occupied houses and an automobile junkyard. In addition, Mr. Street's engineer had still not provided a final site plan and the plans for the Lowe's and Food Lion stores had not been finalized.

The project remained stalled between December 1992 and February 1993. Mr. Street was unable to obtain approved final plans from Lowe's and Food Lion, even though he continued to promise Clark that the plans were immediately forthcoming. At one point, he complained to Lowe's that "I have really stuck my neck out to start Nashville without plans" and insisted that Lowe's delay in providing plans "has drastically changed our projected timing and I hope you can appreciate and understand what we are going through trying to meet the time frame."

The problems caused by the lack of plans were exacerbated by the lack of progress on the site preparation work. By early February 1993, the site still had not been cleared of the tenants, the buildings, or the debris from the automobile junkyard. The excavation of the area where the Food Lion store would be located had also stopped even though the March 1, 1993 deadline for beginning to pour the footings for the store's foundation was fast approaching. It was at this point that the pace of the site work and the scope and cost of the

site work erupted into the first of what would become a series of major disputes among the parties relating to the responsibility for the delays and the additional costs being incurred by Jones Brothers for the site preparation work.

Despite the construction delays, Mr. Street told Clark in February 1993 that he desired to renegotiate the construction budget in light of the changes in the site plan. He asserted that these changes would result in $117,700 in additional profit to Clark but would eventually increase the cost of the site work for Phase II of the project. Accordingly, Mr. Street proposed that the parties "have an understanding which would be fair and equitable to both of us before going to the closing table." Clark was unenthusiastic about this proposal. It had informed Mr. Street in November 1992 that it hoped to increase its profits on the project by performing the construction for less than it had budgeted in order to give it "more of a ‹cushion' for the increased risk that we are taking."

Mr. Street visited the site on February 10, 1993 in response to Clark's continued concern about the progress of the work. Thereafter, he sent Clark a fax stating that the site preparation work had not been slowed by the delays in removing trash from the site. He also insisted that Jones Brothers was not entitled to any extra compensation and that Jones Brothers was "holding up progress more than anything." This fax prompted a heated response from Jones Brothers stating, in part:

> Up until this point, I felt the spirit of cooperation between all involved parties had been very good. I cannot understand why Mr. Street has chosen this time to take an adversarial position and attempt to place any fault on us. I believe "informed" parties would agree we have attempted to make the project progress within the allotted time.

Clark also responded on February 11, 1993, that it did "not want to continue with a letter writing campaign, conference calls, and continuous site meetings to expedite the commencement of sitework operations." Even though clearing the site was not part of the work that Clark had contracted to do, Clark informed Mr. Street that to meet the construction schedule, it had "no choice but to authorize Jones Brothers, Inc. to do whatever is necessary to get the site clean, which is clearly not the responsibility of John S. Clark Company nor [sic] Jones Brothers."

Clark also included in its February 11, 1993 letter a list of four construction activities and seven construction documents requiring immediate action by Mr. Street. The letter concluded: "This letter is not to create any adversarial feelings between you, Clark, and/or Jones Brothers, just to get everyone working together, with the same understanding of the

facts, to get this project moving along properly." Upon receiving this fax, Mr. Street sent his architect a fax asking for three of the construction documents requested by Clark and stating: "Please help me. This project is really getting out of hand and it's close to being canceled by Clark and all involved because of delays. This is very/very serious now. Please help!" He sent a similar fax to his engineer requesting four documents and again stating that "[t]he entire project is in serious trouble because of the deadlines for Food Lion and the approval not coming fast enough. Please/please get these matters cleared up. We are all in trouble if this project falls out of bed. Please help FAST!"

On February 23, 1993, Clark submitted to SENASH the first of ten change orders adjusting the amount of the construction contract based on changes in the work.[8] These change orders described the additional work performed or the other basis for adjusting the amount of the construction contract. They also stated the amount of the adjustment and the previous and revised total amount of the construction contract. Each time Clark sent a change order to SENASH, it also provided Mr. Street with a copy. Mr. Street was aware of the work included in each of these change orders and received copies of most of them at approximately the same time SENASH received the original change order.

Shortly after the February 10, 1993 job site meeting, Clark, with Mr. Street's approval, hired Waste Management, Inc. to set up a facility on site to crush and remove the wrecked automobiles and other debris. Jones Brothers also requested $25,660 for additional work it performed to help clear the site.[9] As a result of these efforts, Clark was able to begin pouring concrete to meet Food Lion's March 1, 1993 deadline even though the site had not been completely cleared and there were still no final building plans.

On March 11, 1993, Mr. Street, Clark, SENASH, RR Westminster, and a group of neighboring property owners held a closing regarding the September 22, 1992 letter agreement between Clark and Mr. Street and other matters relating to the Thompson Station project. On behalf of The Realty Shop, Mr. Street assigned to SENASH his contract with the project architect, his contract with the project engineer, the lease agreements with Food

---

[8]The first change order increased the construction contract by $8,084 and represented the payments Clark had made for local fees and bonds in order "to not delay permit." The construction contract did not obligate Clark to pay these fees. SENASH accepted this change order on March 17, 1993. Mr. Street was aware of and acquiesced in Clark incurring these expenses.

[9]Later, on March 19, 1993, Clark sent Change Order No. 2 to SENASH requesting a $45,607 increase in the contract to cover Jones Brothers' request for $25,660 in additional site preparation work and $16,765 to pay Waste Management for its work on-site. Mr. Street received a copy of this change order. SENASH accepted this change order on March 29, 1993. Mr. Street authorized this work in writing in February and March 1993.

Lion and Lowe's, the permanent loan commitment from Life Insurance Company of Georgia, and the option to purchase the 15.67-acre project site. The Realty Shop and SENASH also executed an option agreement that permitted The Realty Shop to purchase 0.578 acres of the 15.67 acre tract for $10,000.[10]

Mr. Street and RR Westminster also executed an option agreement drafted by Mr. Street's lawyers – one of the pivotal agreements in this litigation. This agreement gave Mr. Street an option to purchase all of the shares of SENASH following the completion of the project. It provided that the base price of these shares would be $6,489,105 and defined the circumstances under which the base price would be either increased or decreased. In addition to requiring an increase in the base price for the actual cost of all the items identified in the indirect cost allowance portion of the project budget, the agreement provided that the base price would be increased as a result of

> any changes made to the Project during the construction period that add to the scope of the Project over that contemplated pursuant to the Base Price . . . as and to the extent that such changes are identified in written change orders therefor and which are agreed to and signed by both Parties.

In addition to giving The Realty Shop an option to purchase either SENASH or the project, the agreement gave Mr. Street or The Realty Shop the "sole and exclusive right to procure a Purchaser for the Project" on behalf of SENASH and RR Westminster, and it defined Mr. Street's compensation if the project sold before The Realty Shop exercised its option to purchase either SENASH or the project. Finally, the agreement contained standard provisions requiring that changes in the agreement and waivers of any of the agreement's provisions be in writing.

Finally, The Realty Shop, SENASH, and Clark executed a "development agreement" relating to Mr. Street's continuing role in the project and his compensation. The parties referred to The Realty Shop as the "Developer." In exchange for a "development fee" of $100,000, The Realty Shop agreed to

> be responsible for monitoring the requirements relating to the effectiveness of the leases and shall undertake such additional duties and responsibilities as Contractor [Clark] and/or Senash shall reasonably request in writing in furtherance of the development of the Property.

---

[10]In another agreement not germane to the present controversy, SENASH and the owners of an adjoining parcel entered into an "agreement for negative covenants" in which the neighboring property owners agreed that they would not permit their property to be used by business competing with Lowe's or Food Lion during the terms of the Lowe's and Food Lion leases.

The development agreement also provided that both The Realty Shop and Mr. Street would indemnify SENASH, Clark, and Clarendon for any costs or expenses arising from contracts or agreements relating to the Thompson Station project entered into prior to the date of the development agreement.

The creation of SENASH to insulate the project from Mr. Street's financial difficulties created some ambiguity concerning the parties' roles for the remainder of the project. Within a week following the March 11, 1993 closing, Mr. Street's mortgage broker explained to Life Insurance Company of Georgia that The Realty Shop was the "developer of the project" and that its "role includes overseeing the contractor, procurement of financing and all other items necessary for the delivery of the completed project."

The project documents substantiate the mortgage broker's characterization of Mr. Street's role. Mr. Street continued to play a far more essential role than simply an interested spectator. He was the "owner's representative" and the "developer" even though he lacked the authority to bind SENASH without prior written authorization. He was solely responsible for negotiating the sale of the completed project, "for monitoring the requirements relating to the effectiveness of the leases", and for performing other duties as requested in writing by SENASH and Clark. In return for this work, Mr. Street was to receive a $100,000 development fee and, more importantly, the difference between the adjusted construction costs and the net proceeds from the sale of the completed project. Accordingly, Mr. Street had a contractual and financial interest in seeing to it that the project was constructed at the lowest possible cost. Mr. Street's conduct between March 11, 1993 and January 28, 1994 leaves little room to question this conclusion.

Delays with both the final site plan and the approved building plans continued to hamper the progress of the construction from March through June 1993.[11] The grading work stopped in mid-March due to a lack of plans for the sewer and storm drains and the lack of materials for the split-rock wall. Clark informed Mr. Street that "we are still shut down more or less on sitework productivity" and reminded him that "[o]ur presence in Nashville is extremely costly to maintain just to coordinate design and approvals, which I understand [sic] in our January 19, 1993 meeting you would be responsible for." Several weeks later, Clark

_____

[11]On March 25, 1993, Clark provided SENASH and Mr. Street with Change Order No. 3 decreasing the construction contract by $114,000 by deleting the allowance for the traffic light, the fees for the architect and engineer, and the Phase I environmental allowance. SENASH accepted this change order on March 29, 1993. Mr. Street never questioned this change order because it benefitted him.

learned that additional construction costs would be incurred because of omissions in the plans necessitating the relocation of both the Lowe's and the Food Lion stores.[12]

During this time, it became evident that there would be additional costs for new work or for corrections in existing work necessitated by the revisions in the plans. When Mr. Street asserted that he would not bear any of these costs, Clark wrote him on April 26, 1993 stating that

> we are going to have to do a complete analysis of the changes on this project and sit down and discuss those resulting from change in scope versus cost savings and value engineering.
>
> I think it is imperative that we resolve these issues as soon as possible. Certainly, the delays that we have encountered in recent weeks have hurt all of us and have been costly. I want us to get together and discuss this in complete detail and determine how we proceed. I want to treat you fairly in every respect and I want my company to be treated fairly in return.

Mr. Street responded on April 27, 1993, stating:

> As you know, I view you as totally honest and trustworthy, a very fair man. This has been demonstrated by our going forward on everything with the understanding we could settle later in a way fair to everyone. I am concerned that some may become greedy and this would only shoot us in the foot on our many future deals. This concern stems from the confusion on what is Value Engineering and what is Change of Scope. My observation on Value Engineering seems to indicate that it takes but never gives?

While striking a conciliatory tone with Clark, Mr. Street pressed the project architect about the lack of completed and approved plans. In an April 28, 1993 letter, he stated that he had "received a call from the insurance company who is the lender on Nashville [Clarendon]. They are extremely upset that the progress is stopped and are threatening a hugh [sic] damage suit against me, the architect and engineer because the work has not been done in a time frame acceptable." Mr. Street also exhorted the architect, saying: "We must all get down and dirty on finishing this project or we shall all be up the creek without a paddle. . .

---

[12]The plans for the Food Lion store violated the fire codes because they omitted a fire door and because the store was too close to the property line. The location of the Lowe's store interfered with a city water main. Moving the location of the Lowe's store was estimated to cost $49,845; while moving the Food Lion store five feet wasted the concrete footings that had already been poured in order to meet Food Lion's March 1, 1993 deadline.

Please lets [sic] get this on the fast track. We cannot delay further. We must all work together."[13]

On June 1, 1993, after Mr. Street failed to indicate that he was ready for the meeting requested in the April 26, 1993 letter, Mr. Venable pointedly asked Mr. Street when he would be ready to "intelligently discuss the Nashville fiasco" and suggested a meeting on June 11, 1993 at Clark's North Carolina office. Mr. Street agreed to the meeting but took issue with the characterization of the project as a fiasco.

Three days later, a serious dispute arose between Mr. Street and Clark concerning Jones Brothers' revised site preparation costs that was to color the parties' dealings for several months. Believing that he was being prevented from obtaining Jones Brothers' cost figures, Mr. Street sent a fax to Clark's project manager, stating: "This will not work! We must have the figures if you are messing with our money. If the $300,000(+-) is in the works we can all forget it. This is totally robbery. Have Jones just use a gun. . . . Now you may not want us involved but (we will be)! Why are you siding with Jones against us? We must work together."

Two meetings were held in North Carolina in mid-June 1993 to address the costs of the site work. At these meetings, Mr. Street and representatives of Jones Brothers and Clark discussed the grading excavations, storm drainage, paving, and the pre-split rock wall. They also considered Jones Brothers' request for a change order for the additional work it was being required to perform and their insistence on a guarantee that they would be paid.[14] Clark's project manager confirmed the parties' June 15, 1993 discussions in a memorandum shared with all participants discussing each of the issues and concluding with the observation that "[i]t is everyone's goal as well as responsibility to finalize change order amounts

---

[13]Clark submitted Change Order Nos. 4 and 5 to SENASH and Mr. Street on May 12, 1993 and May 20, 1993 respectively. Change Order No. 4 increased the construction contract by $30,036 for storm piping and additional design work on the remedy for the slope behind the Lowe's store. Change Order No. 5 increased the construction contract by $19,738, of which $12,750 was for additional work Jones Brothers had performed to remove hazardous waste. The remaining $6,988 was for additional design services to complete the topographic survey and the site plan. SENASH accepted these change orders on May 21, 1993 and May 24, 1994 respectively. Mr. Street authorized this work in writing in March and April 1993.

[14]Mr. Street later asserted that Clark agreed at the June 11, 1993 meeting that any increases in the base price in the option agreement would be capped at $98,000 and that Clark also agreed to a $239,000 credit against the base price in light of the savings that Clark was realizing on the project. These agreements were never reduced to writing, and were never confirmed by the other participants at the June 11, 1993 meeting. Mr. Street's later assertions in this litigation were inconsistent with the existence of this agreement. The trial court did not make a specific factual finding that Clark and Mr. Street had agreed to the $98,000 cap or the $239,000 credit.

-13-

promptly for continued performance on this project. Certainly everyone realizes that damages resulting from non-performance would be substantial."

Following the June 15, 1993 meeting, Mr. Street requested approval from Lowe's and Food Lion to change the paving specifications. He explained that the request was necessitated by "tremendous costs overruns on this project" and that he would not make the request "if we did not need desperately to save on costs."

Difficulties between Mr. Street and Jones Brothers erupted again following the two meetings in North Carolina. After Mr. Street's associate blamed Jones Brothers for the project being behind schedule, Jones Brothers's president tersely informed Clark that

> At this time, I am going on record that we will not assume any responsibility for delays. It was and still is our belief that had the site been ready to start on December 16, 1992, and had the civil plans been correct, we would have completed the site package by June 2, 1993, as originally indicated.
>
> Due to the position the owner [Mr. Street] has taken, we have no other choice but to insist that the pending Change Order Request be completed, as submitted, no later than June 25, 1993. The Change Order also needs to include written direction pertaining to where and how the excess yardage is to be placed and/or stockpiled.

In response to this demand, Clark circulated an internal memorandum to Mr. Street stating that "the project cannot afford to loose [sic] Jones Brothers and remain on any acceptable time schedule" and that Jones Brothers' paving prices were "competitive."

Mr. Street strenuously disagreed with Clark's assessment of Jones Brothers' performance. In a July 7, 1993 fax to Clark, he expressed his "continued amazement the grading prices just keep escalating to astronomical height with no one seemingly doing anything to make Jones Brothers accountable . . .." He also asked "[h]ow can any of us sit back and be raped like this." and added that "I can not and will not keep absorbing these costs which I have not approved . . .. If this money was coming from Clark's bank account I have no doubt, it would be handled forcefully and not just passed off as nothing to be concerned about." The dispute with Jones Brothers came to a head at a heated meeting on July 13, 1993. At the conclusion of the meeting, all the parties agreed to approve a $205,994 change order for Jones Brothers.[15]

---

[15]Mr. Street later agreed that he had approved the change order but testified that he did so only because he was anticipating that Clark would be giving him a $239,000 credit as a result of the June 11, 1993 meeting.

Problems flared up again two weeks later in a dispute over Jones Brothers storing excess top soil on Phase II in accordance with the parties' agreement at their June 15, 1993 meeting. Jones Brothers informed Clark:

> Please be advised, that if we are directed to stop work the equipment on site . . . will be removed before the day is over and placed on other projects. This equipment and man power will no longer be available for this project.
>
> \*　　　　\*　　　　\*
>
> Lee, I'm at the point of shutting down and letting the legal system run its course. It would appear the owner does not want to honor his obligations and expects you or myself to "<u>eat</u>" these cost [sic]. I can assure you that Jones Bros. will not absorb this additional cost.
>
> Due to the position the owner [Mr. Street] has taken and the possible exposure to yourself and Jones Bros., if we have not received written authorization or a clear direction from your firm as to what direction we should be working and who is going to pay for rehandling this material we have no choice but to shut-down and de-mobilize.

Upon receiving a copy of Jones Brothers' ultimatum, Mr. Street replied to Clark that he "deeply resent[ed]" the fact that Clark's project manager had aligned himself with Jones Brothers. He asked, "[w]ho's [sic] side is he on, who does he work for?? This situation has gone from ridkulous [sic] to abusurd [sic]." Clark's project manager responded to Mr. Street that, "[w]e're are all under great pressure to produce this project in a timely manner. Not having a waste pit available as of this writing has placed us all in a crisis situation." Approximately two weeks later, after obtaining a second bid for the paving work, Clark's project manager recommended to Mr. Street that they accept Jones Brothers' bid even though it was slightly higher and requested Mr. Street's authorization to accept the bid.[16]

The Food Lion store was completed and turned over to the tenant in October 1993. Even as this store was conducting its grand opening in November, additional difficulties arose between the parties over the pre-split rock wall behind the Lowe's building. Clark brought the potential failure of this wall to Mr. Street's attention and requested instructions concerning how to address the problem. Mr. Street did not respond immediately.

---

[16]Clark provided SENASH and Mr. Street with Change Orders Nos. 6 and 7 on August 26, 1993 and September 7, 1993 respectively. The combined amount of these change orders was $363,491. Of this amount, $329,782 represented additional work performed by Jones Brothers, including site work, hauling off surplus material, stabilizing the slope behind Food Lion, paving, and breaking up boulders. SENASH approved these change orders on September 2, 1993 and September 14, 1993 respectively. Mr. Street received copies of these change orders and did not object to them.

In anticipation of the sale of SENASH to The Realty Shop, Clark also suggested that all the parties begin "compiling their information" so that they could prepare a "final accounting of this project." Mr. Venable informed Mr. Street of his desire to "sit down together, probably during the first full week of December, in order to finalize the final price to be paid for acquisition of the SENASH stock." Upon receiving Mr. Venable's request for an accounting to finalize the price of the stock, Mr. Street instructed Mr. Epstein to begin compiling their information. Clark's project manager furnished Mr. Epstein copies of the first seven change orders even though copies of these change orders had been routinely furnished to Mr. Street as they were submitted. On December 21, 1993, Mr. Venable sent Mr. Street a draft copy of Change Order No. 8 in the amount of $591,787 covering the increased costs due to the changes in Lowe's prototype plans, site design upgrades, and delay damages. He noted that a substantial portion of the charges stemmed from the delays of the architect and engineer whom Mr. Street had initially hired and suggested that Mr. Street consider how much of these costs should be passed along to the architect and engineer.

On December 22, 1993, The Realty Shop formally notified RR Westminster that it exercised its option to purchase all the stock of SENASH and suggested an escrow closing for December 29, 1993, with a funded closing to follow on January 12, 1994. On the same day, Mr. Venable supplied Mr. Street with an accounting, incorporating Change Order No. 8, showing that the adjusted amount of the construction contract was $5,613,848.

On December 23, 1993, Mr. Street forwarded a detailed response to Mr. Venable's final accounting. He also complimented Mr. Venable for demonstrating "character and trustworthiness throughout" and added, "I trust that we can enter into these final cost negotiations on Nashville, both remaining totally fair and equitable to each other in order to maintain our relationship and keep moving forward together for years to come." Mr. Venable responded on December 27, 1993, stating that "[y]ou can rest assured that the only thing that we want to accomplish on this transaction is to establish a fair price for the value of services delivered. . . Again, we are making this closing a top priority and are available to meet with you at any time to discuss the final accounting, change orders and/or scope changes." On December 28, 1993, Mr. Venable notified Mr. Street of "math errors" in Change Order No. 8 and stated that the amount of the change order had been reduced from $591,787 to $588,987.

Even though Mr. Street and Mr. Venable had been unable to confer to establish an adjusted base price for the SENASH stock, representatives of The Realty Shop, Tennessee Equity Fund, and Life Insurance Company of Georgia met on December 29, 1993 to conduct

the escrow closing requested in Mr. Street's December 22, 1993 letter exercising the option to purchase the SENASH stock. Representatives of SENASH, Clark, and RR Westminster did not attend, but their attorneys telephoned during the closing to talk with the attorney representing Life Insurance Company of Georgia.

In early January, an attorney representing RR Westminster informed The Realty Shop's lawyer that RR Westminster was prepared to close the transaction subject to two conditions: that the money would remain in escrow unless the parties had agreed on the adjusted based price of the SENASH stock and that the parties reach an agreement concerning the unresolved issues involving another Lowe's project in Columbus, Indiana. Mr. Venable also informed Mr. Street that the adjusted base price of the SENASH stock was $7,880,122.31 and provided him with an itemization of the increased costs. In addition, he suggested a meeting "to discuss the increased costs due to scope changes."

Additional problems arose in mid-January. The city declined to issue certificates of occupancy because of the condition of the slope behind the Lowe's store and because of the absence of property line water valves required by the fire marshal. Following a meeting in North Carolina on January 20, 1994, Clark's project manager called Mr. Street's attention to the "long term liability and maintenance on the pre-split rock wall" and warned that the condition of the wall "could also delay release of a permanent occupancy permit for both Food Lion and Lowes."

Following the failed escrow closing on December 29, 1993, Mr. Street became convinced that RR Westminster and Clark intended to sell the completed project directly to Tennessee Equity Fund and to "leave . . . [him] high and dry." He realized that the loss of the expected revenue from the project would cause him an extreme financial hardship because he was counting on the revenue "to help us stave off these financial problems." On January 28, 1994, The Realty Shop filed suit in the Chancery Court for Davidson County against RR Westminster, Clarendon, and Clark seeking equitable relief to require RR Westminster to honor the option agreement. The trial court denied the equitable relief on the grounds that money damages would be an adequate remedy.

Notwithstanding the pending suit, on February 8, 1994, Clark provided Mr. Street with a copy of revised Change Order No. 8 in which the amount of the change order had been reduced by $430,305.[17] In early February, after The Realty Shop declined to take any

_____

[17]SENASH accepted revised Change Order No. 8 on March 31, 1994. The amount of this
(continued...)

action to remediate the problems with the pre-split rock wall, Mr. Venable informed Mr. Street that Clark intended to take immediate steps to correct the problems and that Clark expected to be paid for this extra work.

On February 10, 1994, Clarendon notified SENASH and The Realty Shop that they were in default of the construction loan. The following day, Clark placed a lien on the project to secure payment of the $818,346 balance due under the construction contract.[18] On April 4, 1994, after correcting the problem with the pre-split rock wall and after obtaining the amendments to the restrictive covenants on the neighboring property requested by the permanent lender, RR Westminster sold the completed Thompson Station project to Tennessee Equity Fund for $8,035,000.[19] Before the closing with Tennessee Equity Fund, RR Westminster offered Mr. Street the opportunity to participate in the closing with the understanding that the proceeds would be escrowed until the parties worked out their differences concerning the increased construction costs. Not only did Mr. Street decline the offer, but he attempted to frustrate the closing by filing a lis pendens to place a cloud on the title to the property. The actual closing costs amounted to $361,586. According to Clark, the project's total cost was $7,555,273.[20]

The case was tried from August 21 through August 31, 1995. At the conclusion of the trial, the trial court requested the parties to submit proposed findings of fact and conclusions of law. All parties submitted their proposed findings of fact and conclusions of law on January 5, 1996. On April 4, 1996, the trial court entered an order adopting the findings of fact and conclusions of law prepared by The Realty Shop, except for those findings and conclusions relating to the claims that Clark and Clarendon had maliciously interfered with the option agreement. The trial court awarded The Realty Shop a judgment

---

[17](...continued) change order was later reduced to $318,251 following the receipt of payments from Lowe's and Food Lion.

[18]Clark forwarded Change Order Nos. 9 and 10 to SENASH on March 7, 1994 and March 28, 1994 respectively. Change Order No. 9 increased the construction contract by $61,161 for remediation work performed by Goodrich Testing & Engineering, line valves, and the cost of maintaining a supervisor on the site to oversee the work. Change Order 10 increased the construction contract by $4,350 for additional charges from Goodrich Testing & Engineering. SENASH accepted these change orders on March 8, 1994 and March 30, 1994 respectively. Mr. Street was aware that this work was being performed.

[19]The original sales price had been $8,425,000, a portion of which had been in the form of a $390,000 note that had become worthless by the time of the closing.

[20]The $7,555,273 includes the ten change orders as well as payments by Lowe's and Food Lion for changes in the scope of the work resulting from changes in their prototypical plans.

against RR Westminster for $1,089,674 in compensatory damages and $277,866 in prejudgment interest.[21]

## II.

We turn first to the proper standards of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court itself following a bench trial, the now familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions.

As for a trial court's findings of fact, we review the record de novo and presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We also give great weight to a trial court's factual findings that rest on determinations of credibility. *See In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997). However, if the trial judge has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *See Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Ford v. Ford*, 952 S.W.2d 824, 826 (Tenn. Ct. App. 1996); *Devorak v. Patterson*, 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995).

Reviewing findings of fact under Tenn. R. App. P. 13(d) requires an appellate court to weigh the evidence to determine in which party's favor the weight of the aggregated evidence falls. *See Coles v. Wrecker*, 2 Tenn. Cas. (Shannon) 341, 342 (1877); *Hohenberg Bros. Co. v. Missouri Pac. R.R.*, 586 S.W.2d 117, 119 (Tenn. Ct. App.1979). There is a "reasonable probability" that a proposition is true when there is more evidence in its favor than there is against it. *See Chapman v. McAdams*, 69 Tenn. 500, 506 (1878); 2 *McCormick on Evidence* § 339, at 439 (John W. Strong ed., 4th Practitioner's ed.1992) (stating that "the existence of a contested fact is more probable than its nonexistence"). Thus, the prevailing party is the one in whose favor the evidentiary scale tips, no matter how slightly. *See Bryan v. Aetna Life Ins. Co.*, 174 Tenn. 602, 611, 130 S.W.2d 85, 88 (1939); *McBee v. Bowman*, 89 Tenn. 132, 140, 14 S.W. 481, 483 (1890); *Chapman v. McAdams*, 69 Tenn. at 503.

---

[21]The trial court also awarded The Realty Shop a judgment against SENASH for the net proceeds of the sale of the 0.578-acre outparcel and for the $9,494 in attorney's fees incurred by The Realty Shop as a result of the breach of the outparcel option agreement. These awards are not at issue on this appeal.

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *See Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App.1995); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App.1987). Because of the presumption, an appellate court is bound to leave a trial court's findings of fact undisturbed unless the court determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *See Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App.1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *See Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Presley v. Bennett*, 860 S.W.2d 857, 859-60 (Tenn. 1993); *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998).

Appellate courts review a trial court's finding of fact as a legal matter in one circumstance. When a finding of fact is based on undisputed evidence that can reasonably support only one conclusion, we review that finding on appeal without Tenn. R. App. P. 13(d)'s presumption of correctness. *See Hamblen County Educ. Ass'n v. Hamblen County Bd. of Educ.*, 892 S.W.2d 428, 431 (Tenn. Ct. App. 1994); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 936 (Tenn. Ct. App. 1992).

### III.

The judgment in this case rests upon the trial court's conclusion that RR Westminster breached the March 11, 1993 option agreement by declining to sell SENASH to The Realty Shop for $6,681,530.[22] This conclusion is, in turn, necessarily premised on the conclusion that RR Westminster was not entitled to increase the base price of the SENASH stock to reflect the increased costs of constructing the project. According to the trial court, RR

---

[22]The $6,681,530 purchase price is the sum of the base price in the option agreement ($6,489,105), the additional work Mr. Street concedes he authorized ($73,913), and the total amount of the indirect cost items ($118,512).

Westminster was not entitled to these adjustments because it failed to obtain written change orders as required in the option agreement.

The trial court's conclusion raises two legal and two factual issues. The first legal issue is whether the option agreement requires all increases in the base price of the SENASH stock to be supported by written change orders. An affirmative answer to this issue prompts a second issue – whether the parties may, either by oral agreement or by their conduct, waive their right to insist on written change orders. An affirmative answer to this issue requires the consideration of the first factual issue – did the parties, in fact, waive their right to insist on written change orders. Finally, if the answer to the first factual issue is yes, then the second factual issue is how much should the base price of the SENASH stock be adjusted based on the parties' agreements or conduct.

### A.

Interpretation of a written contract is a matter of law, rather than a matter of fact. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983); *Standard Fire Ins. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 5-6 (Tenn. Ct. App. 1998). The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. *See Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). In the case of written contracts, these intentions are reflected in the contract itself. Thus, the search for the contracting parties' intent should focus on the four corners of the contract, *see Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998); *Hall v. Jeffers*, 767 S.W.2d 654, 657-58 (Tenn. Ct. App. 1988), and the circumstances in which the contract was made. *See Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Pinson & Assocs. Ins. Agency, Inc. v. Kreal,* 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990).

In the absence of fraud or mistake, courts should construe contracts as written. *See Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); *Whaley v. Underwood*, 922 S.W.2d 110, 112 (Tenn. Ct. App. 1995). The courts should accord contractual terms their natural and ordinary meaning, *see Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975), and should construe them in the context of the entire contract. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996); *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). The courts should also avoid strained constructions

that create ambiguities where none exist. *See Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47-48 (Tenn. Ct. App. 1993).

The courts may not make a new contract for parties who have spoken for themselves, *see Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and may not relieve parties of the contractual obligations simply because these obligations later prove to be burdensome or unwise. *See Atkins v. Kirkpatrick*, 823 S.W.2d 547, 553 (Tenn. Ct. App. 1991). Thus, when called upon to interpret a contract, the courts may not favor either party. *See Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990). However, when a contract contains ambiguous or vague provisions, these provisions will be construed against the party responsible for drafting them. *See Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 153-54, 425 S.W.2d 590, 592-93 (1968); *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997).

**B.**

We turn to the option agreement for the answer to the first legal issue – whether the base price of the SENASH stock may be increased only by written change order. The agreement contains only two mechanisms for increasing the base price of the stock. First, the agreement provides that the base price of the stock may be increased, without a written change order, by the "aggregate actual cost of all items set forth under the category of 'Indirect Cost Allowance' as shown on the Project Cost Budget." Second, the agreement provides that the base price of the stock may be increased by

> any changes made to the Project during the construction period that add to the scope of the Project over that contemplated pursuant to the Base Price . . . as and to the extent that such changes are identified in written change orders therefor and which are agreed to and signed by both Parties.

Plainly, the option agreement requires that increases in the base price of the SENASH stock resulting from additions to the "scope of the Project" must be supported by written change orders.

The phrase "scope of the Project" is not defined in the option agreement. On several occasions during construction, Mr. Street questioned Clark's interpretation of the term. To the extent that the lack of a definition of "scope of the Project" created an ambiguity, the burden must be borne by The Realty Shop because the option agreement was drafted by Mr. Street's lawyers.

In the context of this case, the phrase "scope of the project" most sensibly refers to the "work" as that term is defined in the December 14, 1992 construction contract between SENASH and Clark. In the construction industry, the term "work" is commonly understood to refer to the construction being performed by a contractor in accordance with a particular set of contract documents.[23] The December 14, 1992 construction contract defined the work as "all the Work to be performed as required by the Contract Documents for the construction of Thompson Station Shopping Center consisting of a 107,320 SF Lowe's Hardware Store and a __2,316 [unintelligible] SF Food Lion Store." In addition, Article 20 of the contract identified twelve items specifically included within the scope of the "work," and Article 21 identified nineteen items specifically excluded from the scope of the "work."[24]

Neither the construction contract nor the option agreement addresses whether other items that can cause construction costs to increase should be included or excluded from the scope of the project. For example, neither agreement addresses cost increases stemming from (1) unforeseen conditions on the site, (2) delays in clearing the site, (3) defective plans, (4) delays in obtaining completed plans, or (5) delays in tenant approval of building plans. While the construction contract specifically provides that the contractor is entitled to an "equitable adjustment in the Contract Price" for delays in the work that are "not the responsibility of the Contractor," it contains no explicit requirement that this "equitable adjustment" take the form of a written change order.

The terms of separate contracts forming integral parts of a single transaction may be considered together. *See McCall v. Towne Square, Inc.*, 503 S.W.2d 180, 182-83 (Tenn. 1973); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn. Ct. App. 1981). In this case, the December 14, 1992 construction contract and all the contracts executed on March 11, 1993 may be construed together because they are integral ingredients to the development and construction of the Thompson Station project.

---

[23]A common definition of the term "work" in the construction context is "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment, and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or part of the ‹Project'." AIA Doc. A201-1997 General Conditions of the Contract for Construction (American Inst. of Architects 1997).

[24]Among the items Article 21 excluded from the scope of the "work" were: (1) demolition, removal, or any other work involved with existing houses, (2) removal, clean-up or other work associated with junk automobiles, (3) removal of excess materials associated with grading to any off-site location, (4) patching or work required to repair pre-split rock walls if irregularity occurs in rock seams, code compliance upgrades, and (6) additional costs above Lowe's and Food Lion prototype plans.

The option agreement, construed in light of the construction contract, requires change orders for work not included in the work described in the "specific inclusions" in Article 20 of the construction contract. This work consists of the "specific exclusions" listed in Article 21, as well as any other work not directly part of one of the "specific inclusions" in Article 20. Thus, if RR Westminster desired to increase the base price of the SENASH stock by the cost of any work not directly part of one of the "specific inclusions" in Article 20, it had to obtain a written change order signed by The Realty Shop. RR Westminster was not, however, required to obtain a written change order to obtain an "equitable adjustment" for delays in the work that were not its responsibility or to recover increased construction costs caused by delays or errors in the project's plans and specifications, including the plans for the two stores.

## C.

The second legal issue is whether the parties to the option agreement may, either by agreement or by conduct, waive the agreement's provision for written change orders to increase or decrease the base price of the SENASH stock. Again, we must turn to the contract documents and the parties' roles in the construction of the Thompson Station project.

The construction contract executed by SENASH and Clark designated Mr. Street as the "owner's representative." Article 9.5 of the contract provides:

> In order to expedite the project, it may be necessary for the Contractor to proceed with changes in the Work based on verbal authorization from the owner [SENASH] or owner representative [Mr. Street]. As soon as practical, the Contractor will notify the Owner in writing of the cost of the change in the Work and the additional time, if any, necessary to complete said change in the Work.

According to this provision, Mr. Street was empowered to authorize Clark to perform additional work not included in the original contract without first obtaining a written change order.

Even though the construction contract empowered Mr. Street to authorize Clark to perform additional construction work without first obtaining a change order, paragraph two of the option agreement specifically links the base price of the SENASH stock to change orders signed by Mr. Street and RR Westminister. In addition, paragraph thirteen of the option agreement provides that "[n]o change or modification of this Agreement shall be valid

unless the same is in writing and signed by the parties to this Agreement." Similarly, paragraph sixteen states:

> No delay or omission on the part of either party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement; however, any of the terms or conditions of this Agreement may be waived in writing at any time by the party hereto which is entitled to the benefit thereof.

On their face, these paragraphs permit the modification or waiver of any provision of the option agreement as long as the waiver or modification is in writing and is signed by the party entitled to the benefit of the provision being waived.

The trial court specifically found that Mr. Street authorized additional work without first obtaining written change orders signed by all the parties.[25] It also concluded that $73,913 of the cost of this additional work should be added to the base price of the SENASH stock because "The Realty Shop was obligated to execute a change order with RR Westminster in . . . [that] amount."[26] Thus, the trial court concluded that the base price of the SENASH stock could be increased to reflect the cost of additional work even though the additional work was not supported by written change orders signed by The Realty Shop and RR Westminster.

Notwithstanding its decision to increase the price of the SENASH stock by $73,913, even in the absence of a written change order, the trial court declined to increase the base price of the SENASH stock to reflect the cost of other work for which there was no written change order signed by The Realty Shop and RR Westminster. The trial court did not base its decision on a finding that the work was included in the original work or that the work was unnecessary or otherwise incompensable. Rather, the trial court concluded (1) that the requirements of the option agreement could not be waived by the parties except in writing and (2) that, even if informal waiver was permitted, Mr. Street's conduct did not amount to a waiver of the written change order requirement.

---

[25]Paragraphs 7.2 and 7.3 of the trial court's findings of fact state that The Realty Shop signed "work authorizations" for $145,913 in additional work and that it would have signed change orders for this work had change orders been submitted. Portions of this work, however, were included among the items covered by the indirect cost allowance for which no change orders were required.

[26]*See* Paragraph I(A) of the trial court's conclusions of law. The trial court allocated the $72,000 difference between the total of the "work authorizations" and the $73,913 increase in the cost of the work and the price of the SENASH stock to the contingency allowance.

The trial court concluded as a matter of law that neither party to the option agreement could waive the written change order requirement either in words or by conduct. This decision rested on Tenn. Code Ann. § 47-50-112(c) (1995), as interpreted by *Barnett v. Willis*, No. 89-361-II, 1990 WL 186697 (Tenn. Ct. App. June 13, 1990), *perm. app. denied* (Tenn. Nov. 5, 1990) (opinion designated "not to be published"). Tenn. Code Ann. § 47-50-112(c) prevents courts from giving effect to any waiver that is not in writing if the "contract contains a provision to the effect that no waiver or any terms or provisions thereof shall be valid unless such waiver is in writing." In *Barnett v. Willis*, this court found that Tenn. Code Ann. § 47-50-112(c) superceded the Tennessee Supreme Court's holding in *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 482 (Tenn. 1980) that an owner could be held liable for the costs of extra work performed by a contractor even when the parties had not executed the written change orders required by their contract.

There are three reasons why the trial court should not have relied on Tenn. Code Ann. § 47-50-112(c) and *Barnett v. Willis*. First, *Barnett v. Willis* should not have been accorded precedential weight because the Tennessee Supreme Court directed that it should not be published[27] and because this court withdrew it from publication on January 11, 1991. Second, the option agreement does not explicitly state that waivers must be in writing to be valid. Third, even if the terms of the option agreement could only be waived in writing, the record contains at least three writings in which Mr. Street stated that the parties would undertake a "fair and equitable" adjustment of both the construction contract and the option agreement in light of the increased construction costs.

Tenn. Code Ann. § 47-50-112(c) has not figured prominently in many cases since its enactment sixteen years ago. While one court has analogized the statute to the parol evidence rule, *see Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992), few other courts have relied on the statute for more than the proposition that Tennessee courts will enforce written contracts according to their terms. *See Lawhorn & Assocs., Inc. v. Patriot Gen. Ins. Co.*, 917 F. Supp. 538, 542 (E.D. Tenn. 1996); *In re Rachels Indus., Inc.*, 109 B.R. 797, 804 (Bankr. W.D. Tenn. 1990).

---

[27]The Tennessee Supreme Court's denial of the application for permission to appeal was conditioned by its recommendation that "the Court of Appeals opinion not be published." It is commonly understood that this disposition signals the Tennessee Supreme Court's dissatisfaction with the opinion's reasoning but not its result. Thus, despite other panels' reliance on *Barnett v. Willis*, *see Rodgers v. Walker*, No. 03A01-9708-CH-00371, 1998 WL 670381, at *4 (Tenn. Ct. App. Sept. 30, 1998) (No Tenn. R. App. P. 11 application filed), we decline to follow it in this case.

In circumstances analogous to those of this case, the courts of this State have permitted parties who have performed additional work to recover even in the absence of a contractually required written change order. In doing so, the courts have relied on several different theories to support their decisions. The most common basis for permitting recovery for extra work without a written change order is that the parties, by their conduct on the job, waived the requirement.[28] Other courts have reached similar results by relying on the "implied-in-fact contract" theory,[29] the oral recission theory,[30] the estoppel theory,[31] and the quantum meruit theory.[32]

The search for the meaning of a statute is a judicial function. *See Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994); *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 672 (Tenn. Ct. App. 1997). When construing a statute, a court's goal is to ascertain and to give effect to the statute's purpose without unduly restricting it or expanding it beyond its intended scope. *See Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998); *Perry v. Sentry Ins. Co.*, 938 S.W.2d 404, 406 (Tenn. 1996); *Kultura v. Southern Leasing Corp.*, 923 S.W.2d 536, 539 (Tenn. 1996).

The search for a statute's purpose begins with the words of the statute itself. *See Neff v. Cherokee Ins. Co.*, 704 S.W.2d 1, 3 (Tenn. 1986); *Winter v. Smith*, 914 S.W.2d 527, 538 (Tenn. Ct. App. 1995). If the statute is unambiguous, the courts need only enforce the statute as written. *See Hawks v. City of Westmoreland*, 960 S.W.2d 10, 16 (Tenn. 1997); *Carson Creek Vacation Resorts, Inc. v. State*, 865 S.W.2d 1, 2 (Tenn.1993); *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948). The courts must consider the statute as a whole, *see State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998); *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996), and in doing so, they must give the words in the statute their

---

[28]*See Bannon v. Jackson*, 121 Tenn. 381, 392, 117 S.W. 504, 506 (1908) (recognizing that "the parties to the contract may, if they see proper, waive any provision made in the interest of either"); *Moore Constr. Co. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 13 (Tenn. Ct. App. 1985); *see also Hawkins v. Ellis*, No. 02A01-9708-CH-00203, 1998 WL 704521, at *4 (Tenn. Ct. App. Oct. 12, 1998) (No Tenn. R. App. P. 11 application filed); *Birdwell v. McKinney*, No. 01A01-9701-CV-00023, 1997 WL 773730, at *2-3 (Tenn. Ct. App. Dec. 17, 1997) (No Tenn. R. App. P. 11 application filed); *Carter v. Richards*, C.A. No. 116, 1990 WL 209330, at *4 (Tenn. Ct. App. Dec. 21, 1990) (No Tenn. R. App. P. 11 application filed).

[29]*See V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d at 482.

[30]*See Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d at 376.

[31]*See Ford v. Whittle Trunk & Bag Co.*, 12 Tenn. App. 486, 491 (1930); *Hardin Constr. Group, Inc. v. KSI Real Estate Enters., Inc.*, No. 02A01-9103-CH-00040, 1991 WL 114833, at *11-12 (Tenn. Ct. App. July 1, 1991) (No Tenn. R. App. P. 11 application filed).

[32]*See Nashville Painting Corp. v. Ray Bell Constr. Co.*, No. 01A01-9510-CH-00491, 1996 WL 474426, at *4 (Tenn. Ct. App. Aug. 21, 1996), *perm. app. denied* (Tenn. May 5, 1997).

natural and ordinary meaning. *See Davis v. Reagan,* 951 S.W.2d 766, 768 (Tenn. 1997); *Westland West Community Ass'n v. Knox County*, 948 S.W.2d 281, 283 (Tenn. 1997).

Courts should also be mindful of existing law when they construe a statute. *See Still v. First Tenn. Bank, N.A.*, 900 S.W.2d 282, 284 (Tenn. 1995); *First Nat'l Bank of Fulton v. Howard*, 148 Tenn. 188, 194, 253 S.W. 961, 962 (1923). They should also avoid displacing existing statutory or common-law rules and principles any further than the plain meaning of the statute expressly declares or necessarily implies. *See In re Deksins' Estates*, 214 Tenn. 608, 611, 381 S.W.2d 921, 922 (1964); *Harbison v. Briggs Bros. Paint Mfg. Co.*, 209 Tenn. 534, 546, 354 S.W.2d 464, 470 (1962); *Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 282 (Tenn. Ct. App. 1994).

Tenn. Code Ann. § 47-50-112(c) requires little construction because its words are unambiguous and its meaning clear. It prohibits oral waivers or waivers by conduct of any provision of a written contract that contains a "provision to the effect that no waiver of any terms or provisions . . . [of this contract] shall be valid unless such waiver is in writing." The phrase "to the effect" signals the General Assembly's decision that the statute could be triggered by provisions that did not incorporate the exact language in the statute. *See In re Wiley's Estate*, 40 A. 980, 981 (Pa. 1898). Rather, the General Assembly decided that provisions having the same import, significance, or meaning should be given the same legal effect. *See* 5 Oxford English Dictionary 79 (2d ed. 1989).

The question becomes whether the option agreement contains a provision sufficiently similar to Tenn. Code Ann. § 47-50-112(c) that it prevents the parties from waiving any contractual provision unless the waiver itself is in writing. The answer to this question is no.

Instead of restricting waivers of contractual provisions to written waivers, paragraph sixteen of the option agreement provides only that the party to the agreement who is entitled to the benefit of a particular contractual provision "may" waive the term or condition in writing. Paragraph sixteen does not restrict valid waivers only to those that are in writing and does not provide that the parties cannot waive their contract rights in any other way. Thus, the language of paragraph sixteen of the option agreement does not have the same legal significance as the language in Tenn. Code Ann. § 47-50-112(c). The language of paragraph sixteen is not sufficiently similar to Tenn. Code Ann. § 47-50-112(c) to prevent the parties from waiving the written change order requirement in the option agreement either orally or

by their conduct. Accordingly, the trial court erred as a matter of law when it found that paragraph sixteen of the option agreement triggered Tenn. Code Ann. § 47-50-112(c).

### D.

Even if Tenn. Code Ann. § 47-50-112(c) prevented RR Westminster from claiming that the parties waived the written change order requirement either by their words or by their conduct, RR Westminster had two other independent bases for insisting that The Realty Shop had agreed to increase the base price of the SENASH stock. First, Tenn. Code Ann. § 47-50-112(c), by its own terms, does not prevent RR Westminster from seeking to recover the increased construction costs using the other recognized grounds for recovery. Second, the record contains writings by Mr. Street that amount to written waivers of the option agreement's written change order requirement.

### ALTERNATIVE THEORIES OF RECOVERY

We need not recite in detail the elements of claims based on estoppel, quantum merit, or implied-in-fact contract.[33] The largely undisputed facts support recoveries under these theories. Mr. Street knew that the extra work was being performed. While he disagreed with the price for portions of the work, he never disputed the necessity of the work. In fact, he "approved" most of the extra work, although he later insisted that he did so believing that he would not be called upon to pay for the work.[34] Mr. Street has never disputed that the extra work was actually performed or that the extra work benefitted the project.

### MR. STREET'S WRITTEN WAIVERS

If Tenn. Code Ann. § 47-50-112(c) prevented the parties from waiving the written change order requirement without a written waiver, the first factual issue is whether The Realty Shop waived in writing its prerogative to insist on written change orders to alter the base price of the SENASH stock. The trial court found that "RR Westminster failed to prove that The Realty Shop intended to waive the written change order requirement." The evidence

---

[33] *See V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d at 482 (elements of an implied-in-fact contract claim); *Nashville Painting Corp. v. Ray Bell Constr. Co.*, 1996 WL 474426, at *4 (elements of a quantum merit claim); *Ford v. Whittle Trunk & Bag Co.*, 12 Tenn. App. at 491 (elements of an estoppel claim).

[34] Toward the end of the project, Mr. Street did not respond to requests for approval for several items of remedial work covered by Change Orders Nos. 9 and 10, including the 1994 repairs to the pre-split rock wall. However, he never explicitly told Clark that any portion of the disputed work was not necessary to complete the construction of the Thompson Station project.

preponderates against this finding of fact. The record contains at least three instances in which Mr. Street acknowledged in writing that the parties had agreed to adjust the final amount of the construction contract and also the price of the SENASH stock without requiring written change orders.

Mr. Street was directly and intimately involved with this project from its inception to its completion. According to the contract documents, he served not only as the "developer" but also as the "owner's representative." The contract required him "to coordinate and furnish all design" and to "be responsible for monitoring the requirements relating to the effectiveness of the leases." The latter responsibility required Mr. Street to see to it that the construction milestones in the Food Lion and Lowe's leases were met. It is not irrelevant to note at this juncture that the trial court found that most of the disputed costs arose from delays or deficiencies in the project's plans – areas for which Mr. Street was contractually responsible. Mr. Street's heated correspondence to the project's architect and engineer in February and April 1993 reflect his understanding of his role.

The record likewise contains clear evidence that the parties understood that the price of the SENASH stock was directly related to Thompson Station's final construction costs. Mr. Street's own correspondence belies his later assertion that he was simply acting as some sort of Good Samaritan after the March 1993 closing. He knew full well that the increased construction costs would affect his anticipated earnings on the project. For example, on June 4, 1993, Mr. Street demanded the grading subcontractor's revised cost figures, stating that "[w]e must have the figures if you are messing with our money." Likewise, on July 7, 1993, he complained that Clark was not holding the grading subcontractor accountable to its original estimates because the additional costs were not going to be paid by Clark but rather by him.[35] Mr. Street's correspondence and conduct throughout the entire project are consistent with a person having contractual responsibilities for and a financial interest in the timely completion of the project.

The record contains at least three instances in which Mr. Street stated in writing that the price of the SENASH stock would be adjusted without a written change order. The first is a letter Mr. Street wrote to Clark on February 8, 1993 because he desired a share of the savings on the site preparation costs. Mr. Street proposed to Mr. Venable that they "have an understanding which would be fair and equitable to both of us before going to the closing

---

[35]Specifically, Mr. Street stated: "I can not and will not keep absorbing these costs which I have not approved. . . . If this money was coming from Clark's bank account I have no doubt, it would be handled forcefully and not just passed off as nothing to be concerned about."

table." The second is an April 27, 1993 letter responding to Mr. Venable's request that the parties resolve the issues concerning the responsibility for the increased construction costs as soon as possible. Mr. Street again acknowledged in his letter that the parties had agreed to go forward with the construction "with the understanding we could settle later in a way fair to everyone."

The third writing is a December 23, 1993 letter responding to Mr. Venable's earlier letter providing a detailed accounting of the increased construction costs that Clark proposed to use "in determining the price to be paid for the SENASH stock." This accounting included the costs for the extra work covered by the first eight change orders between Clark and SENASH. Mr. Street never mentioned that neither Clark, SENASH, nor RR Westminster had asked him to sign change orders for this work, and he never asserted that he was not responsible for the increased construction cost for lack of properly signed change orders. Instead, he told Mr. Venable: "I trust we can enter into these final cost negotiations on Nashville, both remaining totally fair and equitable to each other in order to maintain our relationship and keep moving forward together for years to come."

Mr. Street's three letters acknowledging the parties' agreement to enter into "final cost negotiations" involving the increased construction costs, including the costs for the extra work, are written waivers for the purpose of Tenn. Code Ann. § 47-50-112(c). Thus, the trial court erred as a matter of fact and of law when it concluded that RR Westminster had no basis for increasing the price of the SENASH stock and that RR Westminster breached the option agreement by refusing to sell the SENASH stock to The Realty Shop for $6,681,530.

### E.

We summarize our conclusions as follows:

(1) The option agreement requires the use of written change orders to increase the base price of the SENASH stock due to increased construction costs for extra work not part of the "specific inclusions" in Article 20 of the construction contract.

(2) The option agreement does not require written change orders for (1) "indirect cost allowance" items as shown on the budget, (2) equitable adjustments for delays in the work not caused by the contractor, or (3) increased construction costs caused by delays and errors in the plans and specifications.

(3) Paragraph sixteen of the option agreement permitting the parties to the option agreement to waive provisions of the option agreement in writing does not

-31-

trigger the restriction against informal waivers in Tenn. Code Ann. § 47-50-112(c).

(4)     Even if paragraph sixteen triggered Tenn. Code Ann. § 47-50-112(c), the statute does not prevent Clark or RR Westminster from recovering the increased construction costs using theories of recovery other than waiver.

(5)     Even if paragraph sixteen triggered Tenn. Code Ann. § 47-50-112(c), the preponderance of the evidence demonstrates that Mr. Street's correspondence during the construction amounted to written waivers of The Realty Shop's right to insist on using written change orders to increase the base price of the SENASH stock.

(6)     RR Westminster did not breach the option agreement by not agreeing to sell the SENASH stock to The Realty Shop for $6,681,530.

Based on these conclusions, we vacate the judgment awarding The Realty Shop $1,089,674 in compensatory damages and $277, 866 in prejudgment interest.

<h1 style="text-align:center">IV.</h1>

The deadlines in the Lowe's and Food Lion leases forced the parties to begin construction before the site had been cleared and before the site plans and building plans had been prepared and approved. Later, errors in the site plan and delays in obtaining approved building plans threatened the timely completion of the work and caused construction costs to increase. While the parties agreed on the work that needed to be done, they disagreed on how the increased costs would be apportioned. Instead of risking the entire project over their disagreement, they decided that they would complete the project as best they could and then, in Mr. Street's words, "settle [up] later in a way fair to everyone."

The parties had lost the spirit of cooperation by the end of the project in 1994. Bitter disagreements over the causes of the construction delays, the cost of the extra work, and the responsibility for paying for the extra work had fostered an adversarial relationship. All parties called in their lawyers and began posturing in order to gain some sort of tactical advantage as the situation deteriorated. Mr. Street became convinced that Clark and RR Westminster were plotting to steal the project from him; while Clark and RR Westminster believed that Mr. Street was trying to avoid paying for additional work that he either ordered or authorized. In this environment, it is not surprising that the parties never completed the "final cost negotiations" in order to arrive at an equitable allocation of the increased costs. This lengthy litigation took the place of the negotiations.

We have determined that the proper resolution of this dispute is to hold the parties to their oral agreement to allocate the increased costs of the Thompson Station project in an

equitable manner.[36] We, therefore, find that the increased costs incurred in completing the project should have been reflected in the option price of the SENASH stock. We also find that The Realty Shop is entitled to receive an amount equal to the difference between the adjusted purchase price of the Thompson Station project and the original base price of the SENASH stock plus the increased costs incurred in completing the project. This amount should be reduced by the actual closing costs and the rent that Food Lion paid to Mr. Street that should have been paid to SENASH.[37]

We find that the adjusted base price of the Thompson Station project paid by Tennessee Equity Fund was $8,035,000.[38] We also find that the original base price of the SENASH stock ($6,489,105) should be adjusted based on the increased construction costs reflected in the ten change orders prepared by Clark and approved by SENASH ($848,772)[39] and the additional indirect costs. In addition, we find that the actual closing costs incurred in the sale of the project to Tennessee Equity Fund amounted to $361,586 and that each component of these costs is fair and reasonable. Finally, we find that Mr. Street collected $50,023 in rent from Food Lion that should have been paid to SENASH.

Accordingly, we calculate the award to The Realty Shop as follows:

| | | |
|---|---|---|
| Adjusted purchase price of Thompson Station | | $8,035,000 |
| Base price of SENASH stock | $6,489,105 | |
| Increased construction costs | 848,772 | |
| Increased indirect costs | 107,897 | |
| Total | | 7,445,774 |
| Subtotal | | 589,226 |

---

[36]Accordingly, we specifically decline to decide which of these parties breached the option agreement first. Were we to undertake this analysis, it is quite plausible that Mr. Street breached the option agreement first by insisting on closing on the SENASH stock at the original base price without making adjustments for the additional work he had either authorized or approved. However, this reasoning would permit RR Westminster to retain the proceeds from the sale of the Thompson Station project to which it is not entitled under the option agreement.

[37]The record reflects that Mr. Street paid this rent into court and that the trial court awarded the rent to RR Westminster and entered an order permitting RR Westminster to withdraw the rent. If RR Westminster has already received the rent, it should not be deducted from the recovery we order herein.

[38]Tennessee Equity Fund originally agreed to pay $8,425,000 for the project with cash and a $390,000 note. Because the note is currently worthless, the purchase price has been reduced by the amount of the note.

[39]This figure includes the final adjustment to Change Order No. 8 to take into account the $107,054 in payments made by Lowe's and Food Lion for the changes in their stores that were not part of their prototypical plans.

| | |
|---|---|
| Actual closing costs | 361,586 |
| Food Lion rent due to SENASH | 50,023 |
| Total Recovery | $ 177,617 |

Based on this computation, we award The Realty Shop a $177,617 judgment against RR Westminster. If RR Westminister has already obtained the Food Lion rent, the judgment shall be increased to $227,640. We also find that The Realty Shop is not entitled to prejudgment interest under Tenn. Code Ann. § 47-14-123 (1995) for two reasons. First, the amount due The Realty Shop was subject to reasonable dispute and was not certain. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994). Second, The Realty Shop must shoulder the responsibility for the parties' failure to complete their post-construction negotiations aimed at allocating the increased construction costs in a fair and equitable manner.

## V.

We affirm the judgment dismissing the malicious interference with contract claims against Clark and Clarendon. We modify the judgment by vacating the awards to The Realty Shop for $1,089,674 in compensatory damages and $277,866 in prejudgment interest and directing the trial court, on remand, to enter a judgment in favor of The Realty Shop and against RR Westminster for $177,617 or for $227,640 if RR Westminster has already received the Food Lion rent. The trial court may grant either party whatever other relief consistent with this opinion that may be warranted. We tax the costs in equal proportions to The Realty Shop, Inc. and to RR Westminster Holding, Inc. and its surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
SAMUEL L. LEWIS, JUDGE

_____
BEN H. CANTRELL, JUDGE