# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### July 10, 2003 Session

## AMPRITE ELECTRIC COMPANY v. TENNESSEE STADIUM GROUP, LLP

### Appeal from the Chancery Court for Davidson County
### No. 99-2847-III     Ellen Hobbs Lyle, Chancellor

---

### No. M2002-00892-COA-R3-CV - Filed September 22, 2003

---

The electrical subcontractor on the Adelphia Stadium job was required by the contractor, on 212 occasions, to perform extra work. Although the subcontract provided that written change orders must precede and authorize extra work, this requirement was soon mutually abandoned because the contractor, encouraged by the owner, was concerned about a timely completion. The principal issue concerns the dollar amount of compensation for the extra work. Amprite priced its extra work according to manuals used in the construction industry, as contrasted to its actual costs plus 10 percent, as the subcontract provides. Amprite concedes that although its actual costs plus 10 percent were substantially less than the amounts claimed, the contractor was estopped to deny the greater compensation. The trial court held that the contract was abandoned and that, in lieu, a different contract would be implied. Amprite was accordingly awarded compensation for "8686 hours never worked, $90,245.00 for materials never purchased and $6,877.00 for taxes never paid," for a total recovery of $1,131,311.66. Contractor appeals insisting that the contract was not abandoned and that its provisions control. We hold that the requirement of written change orders was waived by mutual agreement but that the remainder of the contract was enforceable. The judgment is modified to allow a recovery of $170,084.00.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court as Modified is Affirmed

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which DAVID R. FARMER and HOLLY M. KIRBY, J.J., joined.

Phillip Byron Jones, Nashville, Tennessee, attorney for appellant, Amprite Electric Company.

Craig V. Gabbert, Jr., Nashville, Tennessee, and F. Barry McCabe, Atlanta, Georgia, for the appellee,, Tennessee Stadium Group, LLP.

Todd E. Panther, Nashville, Tennessee, for the Amicus Curiae, The American Subcontractors Association, American Subcontractors Association of Middle Tennessee, and American Subcontractors Association of Western Tennessee.

**OPINION**

This litigation arises out of the construction of the NFL Stadium ("the Project") for the Tennessee Titans. Amprite Electric Company ("Amprite", "the Plaintiff" or "the Subcontractor") was awarded a subcontract for the electrical work ("the Subcontract") and was ultimately paid $10,890,000.00 in accordance with the Subcontract by Tennessee Stadium Group, L.L.P. ( "the Contractor" or "the Defendant"), a limited liability partnership of two foreign corporations experienced in the construction of large projects. During the construction, changes in the various drawings were required to be made, for which the Plaintiff seeks compensation attributable to the extra work occasioned by such changes.

As pertinent here, the Subcontract provides:

> CHANGE ORDERS. Owner has reserved the right under the Contract documents to require Contractor to make changes in the work, including additions thereto and deletions therefrom. Without notice to any surety and without invaliding this Subcontract, Contractor may from time to time, by written order ("Change Order") to Subcontractor, make changes in the work to the same extent and in the same manner as may be required of Contractor by Owner under the Contract documents. Subcontractor shall thereupon perform the changed work in accordance with the terms of this Subcontract and the Change Order.
>
> Upon request of Contractor, and in time and manner sufficient to permit Contractor to comply with its obligations under the Contract documents, Subcontractor shall submit a written proposal for any applicable price and time adjustment attributable to the changed work, detailed as Contractor or Owner may require, supported and conforming to the requirements of the Contract documents.
>
> Where a Change Order is issued pursuant to a change required by the Owner, the price shall be adjusted by the net amount of any direct savings and direct costs plus profit percentage attributable to the Change Order and the time for performance of the work may be adjusted according to the Contract documents . . .

As used in this Subcontract, Subcontractor's direct savings and direct costs shall mean and be limited to the actual amount of the following: cost of materials, including sales tax and cost of delivery; cost of labor, including social security, old age and unemployment insurance, and fringe benefits required by agreement or custom; worker's compensation insurance; bond premiums if and to the extent actually increased; and actual rent not greater than the rent charged in the locale, or reasonable value of Subcontractor-owned equipment and machinery.

If the parties are able to agree upon the amount of the price adjustment and the extent of any time adjustment, such adjustments shall be set-forth in the Change Order which shall be accepted by Subcontractor. If the parties are unable to agree upon such adjustment, Contractor may elect to issue the Change Order to Subcontractor directly such work to be performed by Subcontractor and any adjustments to price or time shall be subject to ultimate determination in accordance with this changed work . . . in no event shall Subcontractor proceed with changed work without a Change Order issued pursuant to this paragraph 8 and Contractor shall not be liable for any additional costs incurred or delays encountered in the performance of such changed work without such a written Change Order.

From the beginning all parties understood that the construction of the stadium was to be aggressively performed. The Construction Management Agreement ("Contract") between the Contractor and the Metropolitan Government of Nashville for Davidson County, Metropolitan Development and Housing Agency ("the Owner" or "MDHA"), included a $10 million contingency fund to be used by the Contractor, in it discretion, to resolve problems arising from additional work in order to keep the Project on schedule. *If this fund was not depleted the Contractor retained it as extra profit.*

To the Subcontract was attached a document identified as Schedule H, which was to be utilized as a uniform method to track the nature and cost of extra work. It provided an agreed upon hourly rate for labor of $27.97 for extra work, and a flat percentage rate for small tool and other expenses. It was also agreed that the hours necessary to perform certain tasks would be those estimated by the National Electrical Contractors Association ("NECA"), and that the pricing of materials for extra work would be as prescribed by the Trade Service Corporation's publication. While the basic Contract provided that Amprite would be paid 'direct costs' for extra work, Schedule H provided that, in calculating these costs, fixed or set rates and prescribed units would be used.

It was agreed that if Amprite was asked to make changes, it would provide Contractor with a Change Order Proposal, commonly referred to as a "COP." Each COP would have attached a

Schedule H in the format provided for in the Subcontract. Pricing would be consistent with NECA and the Trade Service Corporation. The COP would then be approved and thereafter, a change order would be issued, and the additional work would commence consistent with the Subcontract that provided *that in no event was Amprite to perform extra work unless a change order was issued.*

Schedule H was a creation of the Contractor's Project Manager, which had used a similar method in construction of the Olympic Stadium in Atlanta, Georgia. But Amprite historically used Superintendent Work Orders ("SWOs") to document requests for additional work. However, the Contractor insisted during the negotiation phase that the Schedule H be used and that it be attached to and incorporated into the Subcontract. This was because the Manager was familiar with the NECA Manual and the Trade Service Corporation publication and he believed that reliance upon these Manuals was a "fair and reasonable" method to price additional work. According to the Manager, it is also preferable to have a price agreed upon prior to starting extra work in order to eliminate the risks of estimating costs.

Moreover, the Contractor also had an established corporate policy regarding extra work, change orders, and payment for extra work. That policy was promulgated by Contractor's Executive Committee and compliance was mandated by Contractor's auditors. It provided for the execution of change orders before extra work is started.

The Contractor required Amprite to perform additional work to expedite the job or to reconcile problems in the drawings. For instance, the mechanical drawings consistently called for 4-phase motors for pizza ovens in concession stands. The mechanical contractor ordered ovens consistent with the plans, but, the electrical drawings required Amprite to install wiring for 3-phase motors. When this was discovered, the Contractor asked Amprite to replace the wiring in order to facilitate the 4-phase motors in dozens of concession stands.

The Contractor requested Amprite on 212 occasions to perform additional and/or modified work, *without requiring Amprite to provide in advance a COP and/or a Schedule H for costs.* The Project Manager, who regularly instructed Amprite to perform the additional work, admittedly never asked Amprite to provide a Schedule H before requiring Amprite to perform the additional work. He informed Amprite consistently that the additional work was needed and that Amprite should "proceed immediately" and bill Contractor thereafter according to Schedule H. Amprite complied with those requests since it was repeatedly assured by the Contractor that it would be paid and that change orders would be issued. Contractor acknowledges making these representations of payment and concedes that it was "absolutely . . . reasonable for Amprite to believe" Contractor's promises of payment.

Mr. Lassetter, the Project Manager, testified concerning this practice:

> Q.  You admitted yesterday that there were occasions out in the field where you also told Amprite to proceed ahead and you also made a statement to them that they would be paid.

A.      I made the statement yesterday, and I stand by that statement, any time [Contractor] directed Amprite to do work on [Contractor's] behalf, not an Owner initiated change, I did tell Amprite they would be paid.

Q.      Did you ever tell them that before they started the work?

A.      Absolutely.

Q.      Do you think they were reasonable to believe it?

A.      I think that there was trust there and I think it was reasonable for Amprite Electric to believe Louie Lassetter, yes, or, other [Contractor] representatives.

Q.      You said proceed and do this work and you will be paid?

A.      It was a [Contractor] issue, yet, I would say that, and I think that would be reasonable for Amprite to assume and believe me when I said they were going to be paid for it.

Mr. Lassetter conceded that this method, i.e., proceeding with work first (without the benefit of a signed change order) deviated from the contractual scenario and "does involve risks."

In sum, Contractor essentially abandoned the contractual provision of the Subcontract regarding change orders and in the process ignored its corporate policy which mandated written change orders before the extra work was commenced. The absence, therefore, of a written change order is no defense to the claim of the Subcontractor for compensation for the extra work entailed by the oral changes directed by the Contractor. *See*, ***The Realty Shop, Inc. v. RR Westminister Holding, Inc.***, 7 S.W.3d 581 (Tenn. Ct. App. 1999). Whether this conclusion is propelled by implication, or by promissory estoppel, or by quantum meruit, or common sense, is needless speculation. Contractor concedes the point.

But this easy resolution does not carry with it the further conclusion that the Subcontractor was free to ignore the contractual provisions respecting the amount of its compensation for work occasioned by requests to perform additional work.

If there were no advance change orders, Amprite confirmed the requests by letter and a Schedule H calculating the costs according to NECA and the Manual of Trade Service Corporation, utilizing a software styled AcuBid. The extra work for each of the 212 requests using the Schedule H format, was priced by the NECA and Trade Service publications.

The first 24 COPs submitted by Amprite were accepted by the Contractor, who paid Amprite $228,977.00 for the additional work. But the Contractor balked at payment for the remaining 188 COPs; according to Burke Waugh, a senior executive of the Contractor, the Owner was informed that the extra work could not be further funded without approved change orders, even though "we were having to proceed with the work before we could get them to return them approved." Initially, the Contractor's position was that it could not pay Amprite for the 188 COPs because it had not been paid by the Owner, but by April 19, 2000, the Owner paid Contractor the final amount of the contracted price, together with the contingency fee. The Contractor still declined to pay for the remaining COPs, asserting that Amprite had grossly overcharged for the extra work. The essence of the defense is the purported excessiveness of Amprite's pricing of the COPs.

The Contractor asserted, before trial, upon the trial, and in this Court, that Amprite's claims for extra work "were drastically overstated," and that Amprite's cost records show that it misrepresented its direct costs of work. Contractor further asserts that the trial court held that Amprite was entitled to *recover its admittedly overstated claims for extra work* under an implied-in-fact theory, and awarded Amprite compensation for "8686 hours never worked, $90,245.00 for materials never purchased, and $6,877.00 for taxes never paid." This is heady language and a boost to our resolve to study the record of this protracted trial at length. Amprite was awarded $1,265,090.00 for extra work performed, $78,806.79 for certain insurance claims, later discussed, prejudgment interest of 5 percent beginning May 14, 2000, and 5 percent interest amounting to $52,062.87 on retained funds, less credits of $264,648.00, for a total recovery of $1,131,311.66.

Contractor appeals, and presents for review these issues which we reproduce verbatim:

1.    Did the trial court err when it ordered Tennessee Stadium Group ("TSG") to compensate Amprite Electric Company ("Amprite") for hours Amprite admittedly never worked, for materials Amprite admittedly never bought, and for taxes Amprite admittedly never paid?

2.    When TSG and Amprite had entered an enforceable written construction contract that expressly provides that any extra work Amprite performs will be compensated at cost-plus-10%, and when Amprite acknowledged at trial that cost-plus-10% was the proper formula for awarding any compensation for extra work, did the trial court err by awarding Amprite a much greater amount under an implied-contract theory?

3.    Did the trial court err when it held that TSG was estopped from refusing to pay costs that Amprite admits were never incurred.

4.    Did the trial court err by requiring TSG to pay Amprite twice for certain work?

5. Did the trial court err by awarding Amprite judgment on it "builder's risk" insurance claims when (a) Amprite offered no evidence in support of those claims; and (b) the parties' contract expressly precludes builder's risk claims?

6. Did the trial court err when it awarded Amprite interest on retainage that exceeds the compound interest actually earned on the funds in the retainage accounts?

7. Did the trial court properly award Amprite pre-judgment interest when TSG reasonably contested Amprite's admittedly inflated claims?

Amprite also presents for review these issues:

1. Whether the Chancellor, in light of Contractor's admissions, correctly held that Contractor had abandoned the Contract's time consuming Change Order provisions and created instead a separate Contract, implied and by estoppel, as a result of a consistent course of dealing.

2. Whether the Chancellor's calculation of costs, per the Schedule H format, was correct in light of Contractor's admissions that the idea for Schedule H was Contractor's, that it had used the format on earlier jobs, that it used it with other Sub-Contractors on this Project, and that it accepted that form without objection in connection with Amprite's initial bills.

Because the presented issues are tautological, we do not discuss them *in seriatim*, but generally. Our review is *de novo* on the record accompanied with a presumption of correctness, as to factual matters, unless the evidence otherwise preponderates. Rule 13(d) T.R.A.P. Issues of law carry no presumption of correctness. ***Adams v. Dean Roofing Co.***, 715 S.W.2d 341 (Tenn. Ct. App. 1986). If the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true, the judgment must be reversed and rendered. *See,* ***Realty Shop Inc. v. RR Westminister Holding Inc.***, 7 S.W.3d 581 (Tenn. Ct. App. 1999).

## I.

The trial court held:

> The plaintiff's legal right to recover under Tennessee law for this work is not by the court enforcing the terms of the parties contract. The court determines that the contract does not apply to these COPs. Instead, the court awards the recovery based on contract in fact and estoppel.

This conclusion, with which we cannot agree, is essentially based on the finding that the Contractor "made a deliberate decision to dispose with the delay of the change order process so as to bring the project in on time." This finding is supported by a preponderance of the evidence, but in our judgment it does not justify a nullification of the entire Contract. We think the parties essentially waived the requirement for written change orders, a common occurrence, but this waiver, or abrogation of the contractual provision, in no way affected the amount of the compensation for extra work to which Amprite was justly entitled. *See, **Realty Shop**, supra.*

In this jurisdiction, contracts are not taken lightly, and their interpretation is a matter of law the aim of which is first to ascertain and then to give effect to the intentions of the parties. *See, **Gredig v. Tennessee Farmers Mut. Ins. Co.**,* 891 S.W.2d 909 (Tenn. Ct. App. 1994). As we held in **Realty Shop**, *supra*, these intentions, in written contracts, are reflected in the contracts. **Hall v. Jeffers**, 767 S.W.2d 654 (Tenn. Ct. App. 1988). Absent fraud, mistake or waiver, courts are required to interpret contracts as written, giving the language used a natural meaning, and must strive to avoid constructions which create ambiguities where none would otherwise exist. **Whaley v. Underwood**, 922 S.W.2d 110 (Tenn. Ct. App. 1995). It is firmly planted in our jurisdiction that the courts may not make a new contract for the parties. **Petty v. Sloan**, 277 S.W.2d 355 (Tenn. 1955).

Against the backdrop of these settled principles, we conclude that the trial court erred in nullifying the written contract and, in lieu, substituting the legal theories of contract-in-fact and estoppel as bases for recovery. We cannot conceive that such drasticity was required in order to adjust the equities between these parties. To this end it is well to keep in mind, as this record reaches us, that the Contractor does not dispute that the extra work was performed by Amprite, that the Contractor ordered or approved the extra work, and that Amprite is entitled to be compensated.

Contractor insists that the intention of the parties controls the issue of the amount of compensation, which must be ascertained from the Contract, citing **Commerce Street Co. v. Goodyear Tire & Rubber Co.**, 215 S.W.2d 4 (Tenn. Ct. App. 1948) and **Galleria Asso. v. Mogk**, 34 S.W.3d 874 (Tenn. Ct. App. 2000). Its continuing argument is that the Subcontract provides that Amprite is entitled to receive only its direct costs plus 10 percent for extra work performed. Direct cost as defined in the Contract is the actual cost of materials, including sales taxes and delivery charges, costs of labor, including Social Security, old-age and unemployment, insurance and fringe benefits required by custom, worker's compensation insurance, bond premiums, and applicable rent charges.

The extra work performed by Amprite was recorded in separate job numbers. These cost data were maintained at its home offices and were periodically furnished to its job-site office. It was frequently the case that the job costs, as officially recorded, conflicted with the costs reflected on the COPs.[1]

---

[1] Amprite's executive conceded upon the trial that if a Schedule H attached to a COP conflicted with the internal cost records, the cost records should control. The trial court noted: "The defendant proved that in numerous
(continued...)

Suffice to state that during the progress of this protracted trial, Amprite conceded time and again, that many of the 188 COPs with Schedules H attached did not accurately reflect its direct costs as required by the Contract. For instance, in COP 42, with a Schedule H attached, Amprite represented that it incurred 415 man-hours, although its internal cost records revealed only 154 hours; in COP 115 there was a discrepancy of 627 hours; in COP 139, a discrepancy of 505 hours; in COP 144, a discrepancy of 402 hours; in COP 90, a discrepancy of 395 hours; in COP 43 a discrepancy of 313 hours; in COP 75, a discrepancy of 214 hours; in COP 130, a discrepancy of 176 hours; in COP 88, a discrepancy of 174 hours. In sum, Amprite represented that it had invested 19,940 man-hours for extra work, when its internal cost records revealed that it had only worked 11,254 man-hours. We reiterate that Amprite verified, upon the trial, the accuracy of its internal cost records.

With respect to the cost of materials purchased to perform extra work, according to COP 121 Amprite spent $19,881.00, when its internal cost records reveal it spent only $7,387.00; COP 115 claims an expenditure of $14,312.00 as contrasted to internal records revealing that the expenditure was $4,559.00; COP 144 claims an expenditure of $25,901.00, as contrasted to the internal record revealing the expenditure was $18,339.00. COPs 42, 77, 152, 130, 116, 113, 188 collectively claim an expenditure of $44,838.00 as contrasted to actual costs of $25,643.00.

Amprite argues that the Schedule H document, attached to the Subcontract and to each COP, was "established as a uniform measure to track the nature and price of any extra work," and since it provided for an hourly labor rate of $27.99 for extra work, plus additional amounts for other costs, the "direct costs" provided for by the Contract would be calculated by using the fixed ratio used in Schedule H. It further argues that the Contractor's Manager testified that the parties agreed that the hours necessary to perform a certain job would be as prescribed by the NECA Manual.

But we have studied the Manager's testimony carefully. He testified that the NECA rates could be used only when *pricing an estimate before the work was performed*. Significantly, *Amprite's Manager* testified:

> Q. And so rather than go through each and every [COP] you would agree . . . that if there is a discrepancy between Amprite's cost report tracking a given COP, and the Schedule H submitted to TSG [the Contractor] *the actual cost should govern, correct*?
> A. Yes, sir.

The Contractor argues that Amprite's Manager repeatedly admitted that Amprite knew the Contract required it to track its actual costs for extra work, that it knew it was not entitled to more

[1](...continued)
instances the Schedule H forms attached to the COPs listed above deviate from the actual costs incurred in performing the work." As to this, there can be no doubt, the Plaintiff concedes the fact.

than actual costs plus 10 percent, that it knew the Defendant Contractor was relying on Amprite to present it actual costs, but repeatedly submitted Schedule H forms which contained amounts in excess of actual costs, that the Schedule H forms are not a proper basis for determining the amount of compensation due Amprite, and that the proper way to compensate Amprite is to resolve each discrepancy between any Schedule H and its corresponding cost report by reliance upon the cost report and revise the COP claim to reflect the direct cost plus 10 percent. The record supports this argument. The judgment represents a substantial windfall for Amprite[2] which cannot reasonably be justified under any rationale. Amprite is entitled to recover its actual costs for the extra work plus 10 percent, as its Subcontract provides, and nothing more.

## Estoppel

COPs 1 through 24 were accepted by the Contractor, and were later incorporated into eight Change Orders signed by the Contractor which increased Amprite's Contract by $228,977.00 which was routinely paid. Amprite consequently argues that Contractor is estopped to question the remaining COPs, because the proof established clearly that the Contractor agreed to pay for the extra work and did so on twenty-four occasions. We think this argument overlooks the fact that the Contractor, in this litigation, does not deny that Amprite is entitled to be paid for the extra work performed; the issue is the amount of the compensation. The principle of estoppel is not implicated in any way insofar as the *amount* of compensation is concerned. Amprite relies on **Realty Shop**, *supra*, which is inapposite here since the Contractor agreed that Amprite was entitled to be compensated for extra work.

The Contractor cannot be estopped from paying the Schedule H amounts merely because it failed to discover in a timely manner that these amounts were more than Amprite's actual costs plus 10 percent.

The doctrine of equitable estoppel requires evidence of conduct amounting to false representation or concealment of material facts, the intention that such conduct shall be acted upon by the other party, and knowledge of the real facts. **Werne v. Sanderson**, 954 S.W.2d 742 (Tenn. Ct. App. 1997). The party asserting estoppel must prove that it had no knowledge of the truth and could not obtain such knowledge, and that it changed its position to its detriment. *See,* **Warren Bros. v. Metro Govt.**, 540 S.W.2d 243 (Tenn. Ct. App. 1976). This point need not be further labored.

## Extra Costs

The Subcontract defines extra costs in plain language, heretofore recited. Amprite argues that it was justified in using the *estimates* prescribed by the Manuals, notwithstanding that these estimates far exceeded the actual costs recorded in its records and vouchers offered as accurate by

---

[2] Amprite somewhat cryptically refers to the continency fee as having been paid to the Contractor as a "buffer to cover things left out" if the Guaranteed Maximum Price was inadequate. But the Owners representative testified that the "buffer" was spent on various subcontractors, and was "not profit to TSG [the Contractor}."

its executives. We cannot under any legal principle affix a judicial imprimatur to this argument, which redefines windfall. Contractor describes Amprite's bills as "unreasonable, fictitious, and grossly inflated," and far in excess of actual costs plus 10 percent as contractually provided. We agree.

## The Builder's Risk Claims

Amprite was awarded $78,806.79 "on its builder's risk claims."

The Subcontract provides

> [Amprite] hereby *acknowledges it obligation for any loss* to its work, including stored materials, paid for or not, whether or not such loss is reimbursable by Builder's Risk Insurance.

Amprite's builder's risk claims involved repairs to damaged duct work, damage to electric equipment, and tornado damage. Contractor argues that Amprite failed to meet its burden of proof on this issue because Amprite admitted that it did not know whether these claims were valid or whether its losses had been paid by insurance.

Amprite alleged "also outstanding are three claims on Contractor's Builders Risk Insurance which total $96,977.04. Amprite reserves the right to pursue those claims if unpaid." The complaint was amended to allege "the *defendant* has since made a small payment on the Builders Risk Claim, thereby reducing it to $78,806.79." It appears to be reasonably inferential that the builder's risk coverage assumed the balance, but the point is not crucial in light of the quoted contractual provision.

The Defendant pleaded that any payments due to Amprite "for these builder's risk claims are contingent on approval and payment by MDHA, which has not yet occurred."

Amprite's Manager testified that the three claims were submitted [for payment] to the builder's risk insurance company, but he had no knowledge of whether payment had been made.

The trial court's basis for its ruling was "the . . . contract requires a waiver of insurance to be in writing. The defendants did not present a signed waiver." The Contract provided that its terms can be changed only in writing; we find no provision in the Contract which amends the quoted provision that Amprite acknowledges *its obligation* for any loss for its work. The proof presented is meager and somewhat nebulous, and falls short of establishing the liability of the Contractor for these losses.

## Interest on Retained Funds

The trial court awarded Amprite $52,062.87 for "interest wrongfully withheld" on funds retained by the Contractor from each payment request by Amprite. The Subcontract provides for retainage in boiler plate language as one assurance the work will be properly accomplished by the subcontractor.

Tennessee Code Annotated § 66-11-144 provides that the retained funds shall be deposited in a separate escrow account but "shall become the sole and separate property of the . . . subcontractor. . . . All funds accumulated in the escrow account *together with any interest* thereon shall be paid *immediately* to the . . . subcontractor" upon satisfactory completion of the contract.

The proof established that the retention was deposited "to two specific cash accounts" by the *Owner*, which were interest-bearing at a *rate not revealed*, and apparently not inquired into. The Contractor paid the subcontractors, including the plaintiff Amprite, the *actual* interest earned. The total amount of Amprite's retention was $555,948.85, the balance of which, $222,379.54, was "released to Amprite" on May 17, 2000.[3]

Amprite contends that the Contractor violated the statutory requirement that the escrowed funds be deposited in a separate account. Contractor contends that it simply commingled the retained funds of all of its subcontractors which is not prohibited by the statute. In any event we do not see how the procedure employed adversely affected Amprite.

Contractor contends that the calculation of interest by Amprite is erroneous because (1) a fictitious rate of interest [5 percent] was applied[4] as opposed to the actual compound interest rate earned, (2) the accountant failed to consider - did not deduct from the principal - $60,000.00 withheld by the Owner for lighting Amprite admittedly did not install, (3) the award of interest on the retention did not take into account the compound interest earned and paid to Amprite, and (4) since the *Owner* withheld the $60,000.00, Contractor could not be liable for interest thereon. We conclude that from all the evidence this critique of Amprite's calculation of interest is well taken, but in any event all the interest earned on the retainage was paid to Amprite. The award of additional interest is vacated.

## Pre-Judgment Interest

Contractor argues that the trial judge erroneously awarded pre-judgment interest because the costs Amprite incurred are not related to the judgment it seeks, pointing out that the claim was unliquidated and reasonably disputed.

---

[3] $60,000.00 remained in the retention account owing to a dispute concerning work apparently never performed by Amprite.

[4] The record does not reveal the reason why a 5 percent rate was utilized by the accountant. It appears to have been arbitrary.

It is provided by statute that pre-judgment interest may be awarded in accordance with equitable principles. Tenn. Code Ann. § 47-14-123. In *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998) our Supreme Court explained that it

> . . . is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. . . . This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

The Supreme Court expounded further:

> Foremost are the principles of equity. . . . Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing. . . .
>        In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. . . . The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds.

Had Amprite sought to recover only its actual costs plus 10 percent, it unquestionably would be entitled to pre-judgement interest. But Amprite sought to recover a windfall to which it was not entitled. It may reasonably be inferred from this record that if Amprite had simply requested that the Contractor pay its actual costs plus 10 percent for the extra work this litigation would not have been necessary. Under these circumstances, we think it was an abuse of discretion to allow pre-judgement interest.

## Conclusion

In sum, we hold that neither the Contract between the Owner and Contractor nor the Subcontract between the Contractor and Amprite, was abandoned. We hold that the provision requiring Change Orders be in writing was waived by the Contractor and Amprite. We hold that all other portions of the Subcontract are valid and enforceable, particularly the provision which fixes compensation for extra work at actual cost plus 10 percent. We hold that the internal records of Amprite, as generated and authenticated, with respect to its actual costs, prevail over the flat or estimated rates prescribed by Schedule H. We hold that the Contractor was not estopped to insist

-13-

upon proof of actual costs per the Contract. We hold that Amprite failed to prove its entitlement to additional interest on the retainage.

Our analysis of the Exhibits, particularly 9A, 9B, and 12 reveal that the *represented* costs aggregate $897,582.00 as contrasted to *actual* costs of $483,904.00.[5]

The internal reports of Amprite are the sole evidence of its costs. No citation of authority is required for the assertion that it was incumbent upon Amprite to prove its case by a preponderance of the evidence. We think the proof established that Amprite was entitled to recover $447,164.00, less an undisputed credit of $264,648.00,[6] or $170,084.00. The judgment is accordingly modified to allow a recovery of $170,084.00. Costs are taxed evenly and the case is remanded for all appropriate purposes.

_____
WILLIAM H. INMAN, SENIOR JUDGE

---

[5] COPs 99 and 139, [$26,740.00] were allowed, probably inadvertently. The evidence revealed that the work attributed to these COPs was included in the base Contract and for which Amprite had already been paid. The actual costs should accordingly be reduced to $447,164.00. We have studied the testimony of the expert witness Miller and do not agree with Amprite that his calculations of actual costs were $700,309.00

[6] The Contractor claims a credit of $12,452.00 for overpayment of interest on retained funds. We cannot determine from the record whether these numbers are correct any therefor disallow this claimed credit.