IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
APRIL 21, 2009 Session

**IN RE: S.E.J.**
**DONALD JORDAN, ET AL. v. DONALD ROBERSON, ET AL.**

**Direct Appeal from the Chancery Court for Madison County**
**No. 64429, 64437     James F. Butler, Chancellor**

--------

**No. W2008-01354-COA-R3-PT - Filed July 16, 2009**

--------

This case involves competing adoption petitions filed by a child's maternal and paternal grandparents after the child's father was sentenced to death for killing the child's mother. The trial court simply compared the relative fitness of the two sets of grandparents and granted the adoption petition of the paternal grandparents. We conclude that the trial court erred in giving equal weight to both petitions because the paternal grandparents did not meet the requirements set forth in Tennessee's adoption statutes. We also conclude that the maternal grandparents were fit persons to have the care and custody of the child, that they are financially able to provide for the child, and that adoption is in the best interest of the child. Accordingly, we reverse the decision of the chancery court and remand for entry of an order granting the adoption petition filed by the maternal grandparents.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Jeff Mueller, Jackson, TN, for Appellants

David W. Camp, Jackson, TN, for Appellees

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The child at issue in these proceedings, S.E.J., was born in November of 2000. In January of 2005, S.E.J.'s father shot and killed S.E.J.'s mother and two other individuals. S.E.J.'s maternal grandparents, Mr. and Mrs. Roberson, took S.E.J. into their home and petitioned the Madison County Juvenile Court for temporary legal custody of the child. On January 18, 2005, the Juvenile Court entered an order finding that S.E.J. was a dependent child, as S.E.J.'s mother was deceased and her father was incarcerated.[1] The Juvenile Court awarded temporary legal custody of S.E.J. to the Robersons. The Court further ordered that S.E.J.'s paternal grandparents, Mr. and Mrs. Jordan, would be allowed visitation with S.E.J. one weekend per month.

In September of 2006, S.E.J.'s father was convicted of the first degree murder of S.E.J.'s mother and two other individuals and sentenced to death. On December 8, 2006, the Robersons filed a petition seeking to terminate the parental rights of S.E.J.'s father and seeking to adopt S.E.J.[2] The Robersons' petition stated that they had had legal and physical custody of S.E.J. since January of 2005. The Robersons sought to terminate S.E.J.'s father's parental rights pursuant to the ground listed in Tennessee Code Annotated section 36-1-113(g)(7): "The parent has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian . . . ." The Robersons claimed that they were fit persons to have the care and custody of S.E.J. and that it was in the best interest of S.E.J. for the adoption to occur.[3]

On January 29, 2007, S.E.J.'s father joined S.E.J.'s paternal grandparents, the Jordans, in filing their own petition for adoption in chancery court. A sworn "consent and verification" was attached to the petition, in which S.E.J.'s father stated that he joined in the petition "for the purpose of providing his consent to the adoption and for the purpose of terminating his parental rights to [S.E.J.]." The Jordans' petition stated that they were fit persons to have the care and custody of S.E.J. and that it was in S.E.J.'s best interest for the adoption to occur. The Jordans' petition further stated that the Robersons were the current custodians of S.E.J., and had been since January of 2005, but the Jordans noted that they had been awarded visitation rights.

---

[1] Although the Juvenile Court order is dated January of 2004, and other filings refer to the order as being entered in 2004, the parties do not dispute that the murder and custody proceeding took place in 2005.

[2] This petition was mistakenly filed in juvenile court and subsequently transferred to chancery court.

[3] S.E.J.'s father had three other daughters from previous marriages, who were S.E.J.'s half-sisters. S.E.J.'s oldest half-sister was in college, and S.E.J.'s father had obtained custody of the other two half-sisters just a few months prior to the murder. The two younger half-sisters were subsequently adopted by their mother's parents, and they visit with the Jordans occasionally. S.E.J. also had a half-brother, who was born to her mother during a previous marriage. Her half-brother was apparently living with his father.

The chancery court held a two-day hearing regarding both petitions for adoption and the petition to terminate S.E.J.'s father's parental rights. The court subsequently entered a final decree addressing all of the issues on June 16, 2008. The court found that grounds for termination had been proven by clear and convincing evidence and that it was in the best interest of S.E.J. for her father's parental rights to be terminated. Next, the court noted that it had "two competing families seeking to adopt their grandchild." The court stated, "While it is not incumbent upon the Court necessarily to engage in a comparative fitness analysis of the parties competing for adoption rights, the Court has made a comparison of the parties in an attempt to determine what is in the best interest of this particular child." The court went on to state that it was essentially deciding "between two qualified sets of grandparents as to who would be better suited to provide for the child's best interest if an adoption is granted." Despite the court's finding that "[S.E.J.] has done well in [the Robersons'] placement," the court ultimately concluded that the Jordans' adoption petition should be granted and the Robersons' adoption petition should be dismissed. However, the court also found that a cessation of the relationship between the Robersons and S.E.J. "would pose a danger or risk of substantial harm to [S.E.J.] and/or likelihood of severe emotional harm," and accordingly, the court granted the Robersons visitation with S.E.J. one weekend per month. The Robersons timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

On appeal, the Robersons contend that the trial court erred in denying their petition for adoption in favor of granting the Jordans' petition for adoption.[4] For the following reasons, we reverse the decision of the chancery court and remand for expedited proceedings.

## III. STANDARD OF REVIEW

On appeal, we review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

## IV. DISCUSSION

We will begin by discussing what we perceive to be the relevant provisions of Tennessee's adoption statutes, as well as this Court's opinion in *In re Adoption of M.J.S.*, 44. S.W.3d 41 (Tenn.

---

[4] We note that S.E.J.'s father did not appeal the termination of his parental rights.

Ct. App. 2000), which we find sets forth the proper framework for addressing the competing adoption petitions in this case.

"In Tennessee, the adoption statutes are to be strictly construed since they are in derogation of the common law." *In re K.A.Y.*, 80 S.W.3d 19, 23 (Tenn. Ct. App. 2002) (citing *Johnson ex rel. Johnson v. Wilbourn*, 781 S.W.2d 857, 859 (Tenn. Ct. App. 1989)). "Tennessee's adoption statutes limit the parties who may bring an adoption proceeding in this state by imposing certain requirements on such parties." *In re Adoption of M.J.S.*, 44 S.W.3d at 49. For example, Tennessee Code Annotated section 36-1-115, entitled, in part, "Persons eligible to file adoption petition," requires, among other things, that petitioners be over eighteen years of age and a resident of this state, with certain exceptions. Section 36-1-115 also provides that "[t]he petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6)[5] at the time the petition is filed, unless they are filing an intervening petition seeking to adopt the child." **Tenn. Code Ann. § 36-1-115(b) (2005).** In short, the party filing the petition for adoption must have "either physical custody of the child or the right to receive custody of the child pursuant to a validly executed surrender," unless they are filing an intervening petition for adoption. *In re Adoption of M.J.S.*, 44 S.W.3d at 49 (citing Tenn. Code Ann. § 36-1-115(b)).

The adoption statutes contemplate intervention where a third party files a petition seeking to adopt the same child that is subject to a pending adoption petition. *In re Adoption of M.J.S.*, 44 S.W.3d at 51. In order to be eligible to *file* an intervening adoption petition, the petitioner need not have physical custody of the child or the right to receive custody of the child at the time of filing, because the adoption statutes specifically except such intervenors from the statutes' custody

---

[5] Tennessee Code Annotated section 36-1-111(d)(6), which deals with surrenders executed by parents, provides that no surrender shall be valid unless the person to whom the child is surrendered:

(A) Has, at a minimum, physical custody of the child;
(B) Will receive physical custody of the child from the surrendering parent or guardian within five (5) days of the surrender, as evidenced by the affidavit of the person or persons receiving the surrender and by affidavit of the surrendering or consenting parent or guardian or court order;
(C) Has the right to receive physical custody of the child upon the child's release from a health care facility as evidenced by an affidavit of the person or persons or entities receiving the child and by the affidavit of the surrendering or consenting parent or guardian or court order; or
(D) Has a sworn, written statement from the person, the department, the licensed child-placing agency, or child-caring agency that has physical custody pursuant to subdivision (d)(5), which waives the rights pursuant to that subdivision (d)(5).

Subdivision (d)(5) of the statute provides, in relevant part:

Unless the surrender or parental consent is made to the physical custodian or unless the exceptions of subdivision (d)(6) otherwise apply, no surrender or parental consent shall be sufficient to make a child available for adoption in any situation where any other person . . . is exercising the right to physical custody of the child under a current court order at the time the surrender is sought to be executed or when a parental consent is executed . . . .

requirement at that point in the proceedings. *Id.* As set forth above, Tennessee Code Annotated section 36-1-115(b) states that, in order to be eligible to file an adoption petition, "[t]he petitioners must have physical custody or . . . the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) *at the time the petition is filed, unless they are filing an intervening petition seeking to adopt the child*." (emphasis added). Therefore, persons filing an intervening petition for adoption need not have physical custody or the right to receive custody of the child at the time of filing their petition. *In re Adoption of M.J.S.*, 44 S.W.3d at 51.

Nevertheless, in order to ultimately *prevail* on their petition to adopt the child, the intervening petitioners must meet the adoption statutes' custody requirement at a subsequent point in the adoption proceedings. *In re Adoption of M.J.S.*, 44 S.W.3d at 51. Although section 36-1-115(b) excepts intervening petitioners from the custody requirement at the time of *filing* their petition to adopt, other provisions of the adoption statutes do not contain such an exception and contemplate that the intervening petitioners will subsequently obtain custody of the child. *Id.* For instance, the adoption statutes require adoption petitions to state, among other things, "[t]hat the petitioners have physical custody of the child or that they meet the requirements of § 36-1-111(d)(6), and from what person or agency such custody was *or is to be obtained*." **Tenn. Code Ann. § 36-1-116(b)(5) (2005) (emphasis added).** Similarly, the trial court's final order of adoption must state "[t]he date when the petitioners acquired physical custody of the child and from what person or agency or by which court order." **Tenn. Code Ann. § 36-1-120(a)(4) (2005).** In addition, Tennessee Code Annotated section 36-1-116(f)(1) provides:

> Upon the filing of the petition, the court shall have exclusive jurisdiction of all matters pertaining to the child, . . . except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37; provided, that, unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

When faced with interpreting this statute in *In re Adoption of M.J.S.*, this Court stated:

> Although the foregoing statute is not a model of clarity, we interpret this statute to mean that, in cases where an intervening adoption petition has been filed, neither the original petitioners nor the intervening petitioners will be granted an adoption of the child unless the trial court finds that the petitioners have either

physical custody of the child or the right to receive custody of the child pursuant to a validly executed surrender.[6]

44 S.W.3d at 52.

In *In re Adoption of M.J.S.*, 44 S.W.3d at 46, competing adoption petitions were filed by a child's grandparents and an unrelated third party. The child's mother had delivered physical custody of the child to the unrelated third party and executed a surrender of parental rights in favor of the third party. *Id.* Thus, the grandparents did not have physical custody of the child or the right to receive custody pursuant to a valid surrender. The trial court allowed the grandparents to intervene in the adoption proceeding filed by the third party for the limited purpose of presenting evidence regarding the third party's fitness. *Id.* at 48. However, the court refused to allow the grandparents to proceed with their own adoption petition because they did not meet the statutes' custody requirement. *Id.* at 52-53. On appeal, the grandparents argued that the trial court should have given equal consideration to both adoption petitions. *Id.* at 54. We found their argument meritless because only one of the competing petitions met the statutory custody requirement. *Id.* We explained that the grandparents could *file* their intervening petition for adoption even if they did not meet the statutory custody requirement at the time they filed their petition. *Id.* at 53. However, the trial court was not authorized to *grant* the grandparents an adoption unless the grandparents subsequently met the custody requirement. *Id.* Because it was undisputed that the third party was the only petitioner who met the custody requirement at all times pertinent to the adoption proceedings, we concluded that the trial court did not err in refusing to allow the grandparents to pursue their intervening adoption petition.[7] *Id.*

In the case before us, the Robersons stated in their adoption petition that they had had physical and temporary legal custody of S.E.J. since January 18, 2005. The Jordans stated in their adoption petition that the Robersons were the current custodians of S.E.J., but that the Jordans had exercised visitation rights with the child. Pursuant to Tennessee Code Annotated section 36-1-115(b), the Jordans were eligible to file their intervening adoption petition even though they did not have physical custody or the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) at the time the petition was filed. However, the trial court was not authorized to grant the Jordans' petition for adoption unless the court found that the Jordans had "physical

---

[6] We note that the dissent in *In re Adoption of M.J.S.* insisted that the majority had misinterpreted section 36-1-116(f). While acknowledging that the statute was "awkwardly worded," Judge Tomlin concluded that the statute clearly created an exception to the custody requirement for intervening petitioners, where the child sought to be adopted was already in the custody of the original petitioners. 44 S.W.3d at 64. The Tennessee Supreme Court denied the application for permission to appeal filed by the grandparents in *In re Adoption of M.J.S.*, and the legislature took no action to amend the statute following this Court's interpretation. Therefore, we will continue to apply the statute as interpreted by the majority of this Court in *In re Adoption of M.J.S.*

[7] Judge Tomlin, in his dissent, claimed that the trial court should have consolidated both parties' adoption petitions in one trial and simply compared the two prospective adoptive homes using a comparative fitness analysis similar to that used in custody proceedings. *In re Adoption of M.J.S.*, 44 S.W.3d at 65.

custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise [met] the requirements of § 36-1-111(d)(6)." **Tenn. Code Ann. § 36-1-116(f)(1) (2005).** The trial court noted in its final order that S.E.J. was "currently residing on a full-time basis with the Robersons" pursuant to the January 2005 juvenile court order, although she had been "visiting on a regular basis with the Jordans." Although the adoption statutes do not define "physical custody," we conclude that the Jordans did not have physical custody of S.E.J. within the meaning of the adoption statutes simply due to their monthly visitation. In ***In re Adoption of M.J.S.***, 44 S.W.3d at 53, n.3, the grandparents argued that they had physical custody of their grandchild during a period of time when the child and his mother were living in the grandparents' home, but we concluded that this type of arrangement did not constitute "physical custody" by the grandparents. Furthermore, Tennessee Code Annotated section 36-1-116(f)(1) requires the trial court to "find[] in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or [that] the petitioners otherwise meet the requirements of § 36-1-111(d)(6)." The Jordans did not have physical custody of S.E.J. when they filed their adoption petition or when the adoption order was entered, and they did not otherwise meet the requirements of section 36-1-111(d)(6) dealing with surrenders and parental consent.

On appeal, the Jordans claim that they met the statutory requirements because S.E.J.'s father joined in their adoption petition for the stated purpose of consenting to their adoption. They cite Tennessee Code Annotated section 36-1-117(f), which states:

> When the child is related to one (1) of the petitioners or is the stepchild of the petitioner, and the legal or biological parent(s) or guardian(s) of the child signs the adoption petition as a co-petitioner for the specific purpose, as stated in the petition, of giving consent to the adoption, no further surrender, parental consent, or termination of parental rights shall be required as to that parent or guardian, as the act of joining in the adoption petition shall be deemed a complete surrender . . . .

However, section 36-1-111(d)(6) provides that no surrender shall be valid unless the person to whom the child is surrendered:

> (A) Has, at a minimum, physical custody of the child;
> (B) Will receive physical custody of the child from the surrendering parent or guardian within five (5) days of the surrender, as evidenced by the affidavit of the person or persons receiving the surrender and by affidavit of the surrendering or consenting parent or guardian or court order;
> (C) Has the right to receive physical custody of the child upon the child's release from a health care facility as evidenced by an affidavit of the person or persons or entities receiving the child and by the affidavit of the surrendering or consenting parent or guardian or court order; or

(D) *Has a sworn, written statement from the person*, the department, the licensed child-placing agency, or child-caring agency *that has physical custody pursuant to subdivision (d)(5), which waives the rights pursuant to that subdivision (d)(5).*

(emphasis added). Subdivision (d)(5) of the statute provides, in relevant part:

Unless the surrender or parental consent is made to the physical custodian or unless the exceptions of subdivision (d)(6) otherwise apply, *no surrender or parental consent shall be sufficient to make a child available for adoption in any situation where any other person . . . is exercising the right to physical custody of the child under a current court order at the time the surrender is sought to be executed or when a parental consent is executed . . . .*

**Tenn. Code Ann. § 36-1-111(d)(5)** (emphasis added). Based on our reading of these statutes, S.E.J.'s father's parental consent or surrender was not sufficient to make S.E.J. available for adoption by the Jordans because the Robersons had physical custody of S.E.J. pursuant to the temporary custody order.

In sum, a trial court is not authorized to grant an adoption unless the petitioners "have either physical custody of the child or the right to receive custody of the child pursuant to a validly executed surrender." ***In re Adoption of M.J.S.***, 44 S.W.3d at 52. We conclude that the trial court erred in granting the Jordans' adoption petition because they did not meet either statutory requirement. The only petitioners satisfying the statutory requirements were the Robersons, as they had had physical and legal custody of S.E.J. for nearly three years, and they maintained custody throughout the adoption proceedings. Rather than simply comparing the two sets of prospective adoptive parents, the trial court should have allowed the Robersons to proceed with their adoption petition. As it is, both sets of petitioners presented evidence regarding their fitness and the best interest of S.E.J. Thus, we will review the evidence presented in order to determine whether the Robersons are fit persons to have the care and custody of S.E.J., whether they are financially able to provide for S.E.J., and whether the adoption is for the best interest of the child. *See* **Tenn. Code Ann. § 36-1-120(a)(10), (11), (13) (2005).**

S.E.J. was seven years old at the time of trial in May of 2008, and she had been living with the Robersons for three years and four months. Mr. Roberson was seventy-six years old at the time of trial, and Mrs. Roberson was seventy-one. Regarding their health, Mrs. Roberson testified that she was currently taking high blood pressure medication, and Mr. Roberson testified that he took a blood thinner medication and anxiety medication. The Robersons had been married forty-three years, and both were retired. Their monthly income from retirement and social security totaled $1,832, but the Robersons testified that they had no debt on their home or their vehicles, and they did not struggle financially. The Robersons owned another unencumbered property on the lake. S.E.J. also received social security income each month, but the Robersons had saved most of that income, over $15,000, and placed it in accounts in S.E.J.'s name in case something were to happen

to the Robersons. S.E.J. also had a trust fund and other funds being held in accounts on her behalf by various attorneys.

Prior to the murder, the Robersons lived approximately one mile from S.E.J. and her parents. Mrs. Roberson testified that she would see S.E.J. at least once a week, and she babysat for S.E.J.'s parents whenever they needed her. S.E.J. was at the Robersons' house on the day of the murder because S.E.J. had spent the previous night there. Mrs. Roberson testified that she had always treated S.E.J. like one of her own children and she did not foresee any problems if they were permitted to raise her. She said that she and Mr. Roberson both help S.E.J. with her homework every night. Mrs. Roberson testified that S.E.J. was involved in activities such as horseback riding, and she had taken dance lessons in the past. Mrs. Roberson also stated that she and S.E.J. attend church, but not every Sunday. Mrs. Roberson testified that her twin sister, her other daughter, and her neighbor could babysit S.E.J. whenever she needed them.

Several members of the Jordan family also testified at trial, and S.E.J.'s father's evidentiary deposition was submitted. S.E.J. had been visiting with the Jordans one weekend per month over the past three years.[8] Mrs. Jordan testified that she had no complaints about the Robersons' home, S.E.J.'s current school or education, or the activities in which S.E.J. was involved. She said she had no knowledge of any misconduct engaged in by the Robersons, except for the fact that the Robersons had said bad things about S.E.J.'s father to S.E.J. since the murder. Mr. Jordan similarly testified that he did not know much about the Robersons, and that he just did not like the fact that they had spoken poorly of his son since the murder.[9]

It was undisputed that the relationship between the Jordans and the Robersons was tumultuous. The majority of the parties' conflict, and the Jordans' arguments on appeal regarding the Robersons' fitness to adopt, involve the issue of S.E.J. having contact with her father from prison. At trial, the parties disputed whether the juvenile court judge orally instructed the parties to completely prohibit contact between S.E.J. and her father, or whether the judge only addressed in-person visits at the jail, but the original juvenile court order in the record before us does not address such issues. However, the Jordans did not deny that they knew that the Robersons did not want S.E.J. to have any contact with her father during the Jordans' visitation. After the murder, the Robersons did not tell S.E.J. that her father had killed her mother because they thought S.E.J. was

<hr />

[8] Mr. and Mrs. Jordan were age 73 and 66, respectively. Both continued to work full-time, but hoped to retire in the next year. Mr. Jordan had diabetes and had previously suffered a stroke, and he testified that he takes high blood pressure medication, blood thinning medication, and insulin shots. Mrs. Jordan testified that she takes anti-inflammatory medication for carpal tunnel syndrome. S.E.J. would change schools if she lived with the Jordans and attend daycare before and after school and during the summer.

[9] Although the Jordans testified that they had no other complaints about the Robersons' conduct, they submitted evidence suggesting that the Robersons took bus trips to a casino in Tunica fifteen times in the past year. Mrs. Roberson testified that they go to Tunica when S.E.J. is visiting the Jordans or staying with Mrs. Roberson's twin sister. She said they go to have dinner, "play the slots some," and walk around and watch other people play. The Robersons testified that they did not have any debts and had won more money than they had lost.

too young to know the details. Instead, the Robersons told S.E.J. that her father had to move away because he could not live in the same house after S.E.J.'s mother went to heaven. However, in 2007, S.E.J. spoke with her father from prison by telephone while she was visiting the Jordans, and S.E.J.'s father told S.E.J. that he had killed her mother. S.E.J.'s father, who testified by deposition, explained that S.E.J. asked him if he killed her mother, and he said yes and told her that he was "out of [his] mind and didn't know what [he] was doing[.]" When S.E.J. returned to the Robersons' house, she told Mrs. Roberson that she had a secret between her and Mrs. Jordan, and that she had talked to her father and got upset and cried at the Jordans' house. Mrs. Roberson subsequently refused to allow S.E.J. to visit the Jordans. According to Mrs. Roberson, S.E.J. was frightened after talking to her father and feared that something bad would happen to her or to the Robersons. She said S.E.J. had also suffered three anxiety attacks. Mrs. Roberson testified that S.E.J. said that her father killed her mother but he did not know what he was doing. Mrs. Roberson then told S.E.J. that her father did know what he was doing because he had told several people that he was going to kill her mother, and he went back and shot her several times after he had already killed her. Mrs. Roberson testified that S.E.J. asked whether her father would be killed too, and she told her yes, that an "IV" would be placed in his arm and "that's the way that they would take his life for killing her mother."

Mr. Jordan testified that they only allowed S.E.J. to talk to her father on the phone once or twice, and that the first time, it was by accident because S.E.J. happened to answer the phone when her father called. However, S.E.J.'s father testified by deposition that he spoke with S.E.J. three or four times for about fifteen minutes per call. Following these incidents, in November of 2007, the Juvenile Court of Madison County entered an order prohibiting the Jordans from allowing any contact, "direct or indirect, by telephone or other means," between S.E.J. and her father. The Court also ordered both sets of grandparents to refrain from discussing with S.E.J. the details surrounding her mother's murder and her father's death sentence, and the court ordered both sets of grandparents to refrain from disparaging the other grandparents.

The Jordans called S.E.J.'s kindergarten and first-grade teachers to testify at trial. S.E.J.'s kindergarten teacher testified that S.E.J. was very smart but "had a lot of things going on emotionally." The teacher said S.E.J. had a "hard time understanding" what had happened and, at one point, S.E.J. said that her mother was killed by a man with the same name as her father, but that he was not her father. The teacher said she had contact with both of S.E.J.'s grandmothers, and she recalled one negative encounter with Mrs. Roberson. The teacher explained that she had prepared a video slideshow with pictures of the students and their family members and played it at kindergarten graduation. All of the pictures of S.E.J. that she included showed her with Mrs. Jordan, and not Mrs. Roberson. The teacher said that after the video ended, Mrs. Roberson stopped briefly at her desk, for thirty seconds to a minute, and said, in a raised voice, something about Mrs. Jordan not being the one who takes care of S.E.J. The teacher said she cried after Mrs. Roberson left. Mrs. Roberson testified that she subsequently called the teacher to apologize.

S.E.J.'s first grade teacher testified that S.E.J. had no attendance problems, and she described S.E.J. as a good student, academically, making A's and B's, but a "fair" student, behaviorally. She

said S.E.J. often cried for her mother at the beginning of the year, but later, she began talking back and being a little rough with the other kids. The teacher said she sent S.E.J. to see the school counselor, and she spoke with Mrs. Roberson about the issues as well. According to the teacher, Mrs. Roberson acknowledged having some of the same problems at home lately, and she attributed the problems to S.E.J. being allowed to speak with her father from prison while at the Jordans' house. The teacher also said S.E.J. had developed some "bathroom problems," but that S.E.J. and Mrs. Roberson both told her that S.E.J. had been to a doctor regarding the issues. Mrs. Roberson later testified that she had taken S.E.J. to a doctor regarding the issues.

One of the Robersons' neighbors testified that Mr. Roberson brings S.E.J. to her house to ride horses several times a week. She described the Robersons as "very attentive [and] very loving" and said that they "take good care of her." The neighbor stated that S.E.J. was well-behaved and never did anything without her grandparents' permission, and she thought it would be a mistake to remove S.E.J. from the Robersons' home. Another of the Robersons' neighbors testified that she sees S.E.J. playing outside with Mr. Roberson every day, and that the Robersons and S.E.J. had a loving relationship. Another neighbor testified that she often sees Mr. Roberson outside in the yard with S.E.J. playing ball and laughing as if they are "having a good time." These neighbors and other witnesses for the Robersons testified that the Robersons possessed excellent parenting skills.

S.E.J. had been receiving counseling for just over one year at the time of trial. Although her therapist did not testify at trial, the parties introduced S.E.J.'s counseling records and a letter from her therapist. S.E.J.'s therapist reported that S.E.J. generally displayed a very positive mood and neat appearance at her counseling sessions, although S.E.J. had voiced various feelings of sadness, anger, and confusion. The therapist reported that S.E.J. seemed to be coping as well as could be expected, given the tragic situation, and that S.E.J. "appears to be stable in her current environment." The therapist noted that S.E.J. loved both sets of grandparents, was very sensitive to her grandparents' feelings, and, in the past, had felt "caught in the middle." S.E.J. had reported to her therapist that she was allowed to speak with her father when she was at the Jordans' house, but that she was not supposed to tell Mrs. Roberson because she would be mad. The therapist concluded her letter by stating that S.E.J. deserved to have a relationship with both sets of grandparents, but that, in her professional opinion, the family members would need to cooperate and avoid conflict in order for S.E.J. to remain stable. S.E.J.'s counseling records indicate that S.E.J. was diagnosed with "adjustment disorder with depressed mood." Mrs. Roberson testified that, at the time of trial, S.E.J. still cried for her mother at some point every day.

Having reviewed the evidence in its entirety, we conclude that the Robersons' petition for adoption should be granted. The Robersons had a close relationship with S.E.J. prior to the murder, and at the time of trial, S.E.J. had been living with the Robersons for over three years, since she was four years old. The Robersons had demonstrated that they were capable of providing proper care and a loving home for S.E.J. Also, it is undisputed that the Robersons are financially able to meet S.E.J.'s needs, and they had saved money for S.E.J.'s future use. The Robersons are both retired and available to care for S.E.J. whenever she is not in school, and they also have family members and neighbors available to babysit S.E.J. if necessary. The Robersons help S.E.J. with her homework

and participate in outdoor activities with her. S.E.J. had no attendance problems and was doing well academically at her current school. Although, understandably, S.E.J. has experienced emotional issues, the Robersons were attempting to address S.E.J.'s emotional needs by taking her to counseling to deal with her issues. S.E.J.'s therapist reported that S.E.J. was coping as well as could be expected given the tragic situation, and that S.E.J. "appears to be stable in her current environment." In light of S.E.J.'s adjustment disorder diagnosis, the significance of her stability with the Robersons should have been recognized by the trial court. The Jordans themselves testified that they could not say anything negative about the Robersons other than the fact that they had spoken negatively about S.E.J.'s father since the murder. We note that both sets of grandparents appear to have shortcomings when it comes to dealing with S.E.J.'s father and with each other, but we cannot say that the Robersons should bear the blame for that conflict any more than the Jordans. S.E.J.'s therapist aptly recognized that S.E.J. loves and deserves to have a relationship with both sets of grandparents, and that they should put aside their differences to promote stability for S.E.J. We conclude that the Robersons are fit persons to have the care and custody of S.E.J., that they are financially able to provide for her, and that adoption by the Robersons is for the best interest of S.E.J. *See* **Tenn. Code Ann. § 36-1-120(a)(10), (11), (13) (2005).**

We remand this case to the trial court for entry of a final order of adoption in accordance with Tennessee Code Annotated section 36-1-120. The trial court should determine the appropriate manner of transferring custody of S.E.J. to the Robersons and address any issues regarding visitation by the Jordans.

## V.  CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court and remand for expedited proceedings. Costs of this appeal are taxed to the appellees, the Jordans, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-12-